Scalia, Circuit Judge, filed a dissenting opinion.

**CENTER FOR AUTO SAFETY, et al., Petitioners,**

v.

**NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, et al., Respondents,**

**General Motors Corporation, Automobile Importers of America, Inc., Ford Motor Company, Intervenors.**

**No. 85–1231.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 14, 1986.

Decided June 20, 1986.

Cornish F. Hitchcock, with whom Alan B. Morrison and Clarence M. Ditlow, III, Washington, D.C., were on brief, for petitioners. Katherine I. Hall, Washington, D.C., also entered an appearance, for petitioners.

Enid Rubenstein, Atty., Nat. Highway Traffic Safety Admin., with whom Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, David W. Allen and Stephen P. Wood, Asst. Chief Counsels, Nat. Highway Traffic Safety Admin., John F. Cordes, Marleigh D. Dover, Attys., Dept. of Justice and J. Edward Glancy, Atty., Nat. Highway Traffic Safety Admin., Washington, D.C., were on brief, for respondents.

Howard P. Willens, with whom Raymond C. Clevengar, III, Washington, D.C., Paula Winkler-Doman and James A. Brown, Dearborn, Mich., were on brief, for intervenor, Ford Motor Co. Bruce M. Berman, Washington, D.C., also entered an appearance, for intervenor, Ford Motor Co.

Milton D. Andrews, Lance E. Tunick, Washington, D.C., William L. Weber, Jr. and Thomas L. Arnett, Detroit, Mich., were on brief, for intervenors, Auto. Importers of America, Inc. and Gen. Motors Corp.

Before EDWARDS, SCALIA and BUCK-LEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge SCALIA.

HARRY T. EDWARDS, Circuit Judge:

The National Highway Traffic Safety Administration ("NHTSA") is required to set mandatory fuel economy standards for passenger cars and light trucks pursuant to the Energy Policy and Conservation Act of 1975 ("EPCA").[1] In October 1984, NHTSA issued a final rule that amended its previously published fuel economy standards for light trucks for the 1985 model year and established light truck standards for the 1986 model year.[2] The new 1985 standard required each manufacturer to achieve a fleetwide average fuel economy of 19.5 miles per gallon ("mpg") for its light trucks, a reduction of 1.5 mpg from the original 1985 standard of 21.0 mpg. The 1986 model year standard was set at 20.0 mpg, which also represented a retreat from the original 1985 requirement.

The petitioners, four non-profit consumer organizations that work to promote energy conservation,[3] challenge this rule. They allege that NHTSA has violated EPCA's requirement that the agency designate standards at "the maximum feasible average fuel economy level."[4] The gravamen of their complaint is that the 1985 and 1986 model year standards are too low because in determining those standards, NHTSA gave impermissible weight to shifts in con-

---

1. Pub.L. No. 94–163, 89 Stat. 871 (1975) (codified as amended in 15 & 42 U.S.C.).

2. 49 Fed.Reg. 41,250 (1984).

3. In addition to the Center for Auto Safety, the petitioners are the Environmental Policy Institute, Public Citizen and Union of Concerned Scientists.

4. 15 U.S.C. § 2002(b) (1982).

sumer demand toward larger, less fuel-efficient trucks.

As a threshold matter, the petitioners plainly have standing to bring this action in a representative capacity for members of their organizations. Their members have suffered injury-in-fact because the vehicles available for purchase will likely be less fuel efficient than if the fuel economy standards were more demanding. This injury can be traced to NHTSA's rulemaking and is likely to be redressed by a favorable decision. Thus, all of Article III's requirements for standing are met.

The Government argues that the petitioners' concerns are not injuries, but merely "generalized grievances" and, as such, cannot be considered by this court. The Government's argument reveals a fundamental confusion between the *prudential* principle that courts generally "refrain[ ] from adjudicating 'abstract questions of wide public significance' ... most appropriately addressed in the representative branches"[5] and the *constitutional* requirement of injury. Moreover, the Government overlooks the fact that an injury shared by a large number of people is nonetheless an injury.

Generally, under EPCA, judicial review of agency action establishing Corporate Average Fuel Economy ("CAFE") standards may be sought by "[a]ny person who may be adversely affected by" the promulgation of any such rule.[6] This provision reveals a congressional intention to endorse standing that is coterminous with the full reach of standing permitted by Article III. Therefore, this court has no authority to ignore the will of Congress and reject petitioners' standing on prudential grounds.

On the merits, it must be concluded that EPCA permits NHTSA to consider consumer demand in setting fuel economy standards, and that the agency has reasonably balanced the competing policies of the statute in the rulemakings at issue. The petition for review must therefore be denied.

## I. BACKGROUND

### A. *Statutory Framework*

In the wake of the 1973–1974 Arab oil embargo, Congress enacted EPCA with the purpose of enhancing the supply of fossil fuels in the United States through increased production and energy conservation programs.[7] The Act established a major program to bring about improved motor vehicle fuel efficiency.[8] Title III of EPCA added Title V to the Motor Vehicle Information and Cost Savings Act ("MVICSA"),[9] requiring the Department of Transportation ("DOT") to establish mandatory CAFE standards for passenger cars and for lightweight vehicles, termed "light trucks," which include vans, pickups and jeeps.

The CAFE standards set a minimum performance requirement in terms of an average number of miles a vehicle travels per gallon of gasoline or diesel fuel. Individual vehicles and models are not required to meet the mileage standard; rather, each manufacturer must achieve *an average* level of fuel economy for all specified vehicles manufactured in a given model year.

Section 502(b) of the Act directs the Secretary of DOT ("Secretary") to prescribe, by rule, standards for light trucks.[10] The Secretary may set separate standards for

---

**5.** *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)).

**6.** 15 U.S.C. § 2004(a) (1982).

**7.** *See* 42 U.S.C. § 6201 (1982).

**8.** Motor vehicles are the single largest end user of petroleum. When EPCA was enacted, they accounted for approximately 40% of total United States petroleum consumption. *See* H.R.REP. No. 340, 94th Cong., 1st Sess. 86 (1975) [hereinafter House Report]; S.REP. No. 179, 94th Cong., 1st Sess. 2 (1975) [hereinafter Senate Report], U.S.Code Cong. & Admin.News 1975, p. 1762.

**9.** 15 U.S.C. §§ 2001–2012 (1982).

**10.** The Secretary has, in turn, delegated authority for the administration of MVICSA to the Administrator of NHTSA. 49 C.F.R. § 1.50(f) (1985).

different classes of light trucks, and they "shall be set at a level which the Secretary determines is the maximum feasible average fuel economy level which such manufacturers are able to achieve in each model year...." [11] Congress directed the Secretary to consider four factors in determining the "maximum feasible" fuel economy level:

(1) technological feasibility;

(2) economic practicability;

(3) the effect of other Federal motor vehicle standards on fuel economy; and

(4) the need of the Nation to conserve energy.[12]

The Secretary may amend the standard, but amendments must also require the "maximum feasible average fuel economy level." [13] All standards are to be set at least 18 months prior to the beginning of the model year [14] and any amendment that makes a CAFE standard more stringent must also be promulgated at least 18 months prior to the start of the model year.[15]

At the end of each model year, the Environmental Protection Agency ("EPA") calculates the fuel economy level each manufacturer has achieved based on the fuel economy of each model and the number of vehicles manufactured in each model line.[16] If a manufacturer fails to meet a standard, the Secretary "shall assess" civil penalties.[17] The Secretary has limited authority to modify or cancel the penalty when (1) necessary to prevent bankruptcy of the manufacturer; (2) the violation is a result of an act of God, strike or fire; or (3) the Federal Trade Commission ("FTC") certifies that modification of the penalty is necessary to prevent a "substantial lessening" of competition.[18] The Act also establishes credits, calculated in the same manner as the penalties, if a manufacturer exceeds the CAFE standard. Manufacturers may carry the credits forward or backward for up to three model years to cancel or reduce penalties.[19]

Finally, the Act provides for judicial review initiated by "[a]ny person who may be

11. 15 U.S.C. § 2002(b) (1982).

12. *Id.* § 2002(e). NHTSA has interpreted these factors as follows:

> "[T]echnological feasibility" means that consideration must be given to whether particular methods of improving fuel economy will be available for commercial application in the model year for which a standard is being established. This does not mean that the technology must be available or in use when a standard is proposed or issued. "Economic practicability" is interpreted to require a consideration of whether the implementation of projected fuel economy improvements is within the economic capability of the industry. "The effect of other Federal motor vehicle standards on fuel economy" requires an analysis of the unavoidable adverse effects on fuel economy of compliance with emission, safety, noise, or damageability standards. Thus, for example, this analysis projects the impact on fuel economy of the use by the manufacturers of the most fuel efficient emission control systems. Finally, "the need of the Nation to conserve energy" requires consideration of the consumer cost, national balance of payments, environmental, and foreign policy implications of our need for large quantities of petroleum, especially imported petroleum.

> 42 Fed.Reg. 63,184, 63,188 (1977).

13. 15 U.S.C. § 2002(f)(1) (1982).

14. *Id.* § 2002(b).

15. *Id.* § 2002(f)(2).

16. EPCA authorizes the calculation of light truck average fuel economy in accordance with EPA rules. *Id.* § 2003(a)(2). For each model, EPA divides the number of vehicles manufactured in that model line by the fuel economy measured for that model. The total number of light trucks manufactured in a given model year is then divided by the sum of the calculations for each separate model. *See* 40 C.F.R. § 600.-510 (1985).

17. 15 U.S.C. § 2008(a)(2) (1982). The penalties are calculated by multiplying $5 by the number of tenths of mpg by which the fleet average fails to attain the standard and by the number of vehicles subject to the standard in the fleet manufactured that year. *Id.* § 2008(b)(1)(B). A 1978 amendment allows the Secretary to base the calculation on $10 per tenth of a mpg if he finds such a step is necessary to improve conservation efforts and would not have "substantial deleterious impacts" on the economy. *Id.* § 2008(d)(1)(A).

18. *Id.* § 2008(b)(1)(B)(3).

19. *Id.* § 2002(*l*).

adversely affected by any rule prescribed under section 2001, 2002, 2003 or 2006 of this title." [20]

### B. *Rulemaking Proceedings*

For the model years at issue here, NHTSA issued separate standards for four-wheel drive and two-wheel drive light trucks.[21] Within both these categories NHTSA has established two sub-classes: (1) "captive imports," which are defined as vehicles marketed by a domestic manufacturer but produced by a foreign company and (2) "other" vehicles, which covers a manufacturer's domestic production.[22] In addition, NHTSA issued a "combined" standard. Manufacturers have two options: they may meet the combined standard for their entire light truck fleet or they may meet the separate standards for the two-wheel drive and four-wheel drive categories. The combined standard is set at a level intermediate to the two-wheel drive and four-wheel drive standards.[23]

### 1. *The Standard for Model Year 1985*

In 1980, NHTSA set the light truck combined CAFE standards for 1984 and 1985 at 20.0 mpg and 21.0 mpg, respectively.[24] These standards were based on projections of sales of various models calculated on the assumption that manufacturers would introduce new models of fuel-efficient light trucks and that consumer demand for these vehicles would be strong due to high prices and reduced supplies of gasoline.[25] The standards for 1984 and 1985 were set at the fuel economy levels attainable by the "least capable" manufacturer, Ford Motor Company ("Ford"). The agency acknowledged that higher standards could result in the introduction of new models or technologies by Ford, but also recognized the uncertainty of financing to undertake such ventures. It also cited the possibility that Ford might restrict the sale of its larger trucks or choose to pay penalties, thus further eroding its position in the marketplace.[26]

In November 1983, Ford petitioned NHTSA to lower the light truck CAFE standards for model years 1984 and 1985 by carrying the 1983 standards over to 1984 and carrying the 1984 standards over to 1985. This amendment would have lowered the combined light truck standards by 1 mpg each year to 19 mpg and 20 mpg for 1984 and 1985, respectively. Ford argued that a change in the standards was necessary due to changes in the "price of fuel, the attendant consumer reaction to falling fuel prices and stable fuel availability, and

---

**20.** *Id.* § 2004(a).

**21.** NHTSA established separate categories because four-wheel drive vehicles are normally less fuel-efficient than two-wheel drive, and because some manufacturers produce predominately four-wheel drive vehicles. 43 Fed.Reg. 11,995, 11,997–98 (1978).

**22.** These subdivisions are an attempt to discourage domestic manufacturers from meeting the CAFE standards by increasing sales of their more fuel-efficient captive imports, which could reduce domestic employment. *Id.* at 11,999.

**23.** The optional combined standard was established to permit manufacturers greater flexibility in determining where to concentrate improvements in fuel economy. 45 Fed.Reg. 81,-593, 81,594 (1980). For simplicity, reference will be made primarily to the combined standard.

**24.** *Id.* at 81,600. The two-wheel drive standards were set at 20.3 mpg and 21.6 mpg for the 1984 and 1985 model years, respectively. The corresponding four-wheel drive standards were 18.5 for 1984 and 19.0 for 1985.

**25.** *Id.* at 81,598.

**26.** *Id.* at 81,599. The agency distinguished the approach it used in setting standards for model year 1982, which were set at levels higher than Chrysler Corporation ("Chrysler"), the least fuel-efficient manufacturer in that year, was projected to achieve. Chrysler's light trucks represented only 10–15% of domestic sales in 1982, while Ford's accounted for 35%. Furthermore, Chrysler had earned sufficient credits for exceeding the CAFE standards in earlier years to offset most of the penalties. *Id.*

In earlier model years, the standards were set at a level attainable by all manufacturers because of insufficient lead time for producers to make major new improvements. *See* 43 Fed. Reg. 11,995, 12,012 (1978) (1980–1981 model years); 42 Fed.Reg. 13,807, 13,808 (1977) (1979 model year).

the increasing import penetration into the truck market."[27] On January 30, 1984, Ford followed up its initial request with a petition for even greater reductions in standards for the 1985 model year, proposing 19.5 mpg for the combined light truck standard.

In response to Ford's request, NHTSA published a Notice of Proposed Rulemaking on the 1984 and 1985 light truck standards in May 1984. The agency proposed to deny Ford's requested weakening of the 1984 standards because the model year was already underway.[28] However, for the 1985 model year, NHTSA proposed to adopt Ford's requested level of 19.5 mpg, although it estimated that this amendment could eliminate gasoline savings of up to 1.1 billion gallons.[29] In discussing the proposed modifications, the agency noted that consumer demand for small trucks was "significantly higher" than NHTSA had projected in 1980. However, although small truck sales by domestic companies accounted for a greater proportion of sales than had been anticipated, the bulk of the demand for small models was being satisfied by foreign imports. Significantly, domestic manufacturers were selling a higher proportion of trucks with larger displacement engines than the agency had projected in 1980, while experiencing lower sales of the smaller, more fuel-efficient engines and diesels.[30]

In October 1984, NHTSA issued a final rule adopting Ford's proposed amendments for 1985.[31] The agency stated that the original standards were based on projections of sales of new compact pickup, utility and van models, which had not been achieved because consumer demand for larger vehicles and engines was greater

than had been anticipated. NHTSA projected that Ford could only achieve a fleet-wide average of 19.5 mpg for model year 1985. The agency attributed the 1.5 mpg loss in fuel economy capability from its earlier projections to the following factors: increases in demand for larger displacement engines (0.9 mpg), increases in average weight due to demand for larger vehicles (0.5 mpg), drop in demand for diesel engines (0.1 mpg), engine calibrations to improve performance (0.2 mpg), and other factors such as a higher proportion of four-wheel drive trucks in the fleet and deletion of lubrication improvement (0.2 mpg). These effects were partially offset by a 0.4 mpg gain due to the introduction of electronic fuel injection. Similar revised projections suggested that General Motors Corporation ("GM") and Chrysler would achieve fuel economy levels of 20.0 mpg and 20.3 mpg, respectively.[32]

As in its original formulation of the 1985 model year standards, the agency based the new industry standard primarily on Ford's maximum fuel economy capability. In support of this decision, NHTSA reiterated its view that it has a responsibility to set standards at a level that can be achieved by a manufacturer with a substantial share of the market.[33]

2. *The Standards for Model Years 1986–1987*

In March 1984, NHTSA published a Notice of Proposed Rulemaking for light truck fuel economy standards for the 1986 and 1987 model years. Rather than proposing a specific standard, it suggested a range of 20.0 to 21.5 mpg for model year 1986 and 20.0 to 22.5 mpg for model year 1987.[34]

**27.** Letter from Ford to Diane Steed (Nov. 21, 1983), *reprinted in* Joint Appendix ("J.A.") 79.

**28.** 49 Fed.Reg. 22,516 (1984).

**29.** *Id.* at 22,519.

**30.** *Id.* at 22,517.

**31.** 49 Fed.Reg. 41,250 (1984). In addition to lowering the combined light truck standard to 19.5 mpg, the agency reduced the 1985 two-

wheel drive standard to 19.7 mpg and the four-wheel drive standard to 18.9 mpg. *Id.* at 41,254.

**32.** *Id.* at 41,252.

**33.** *Id.* at 41,251.

**34.** 49 Fed.Reg. 8,637, 8,639 (1984).

After comment, NHTSA set the light truck combined standard for 1986 at 20.0 mpg and deferred issuance of the 1987 standards.[35] The agency projected that Ford would be able to achieve an overall fuel economy level of 20.4 mpg in 1986, a gain of 0.9 mpg over the 1985 projection, due to technological improvements and growth in demand for small vans.[36] It projected a composite average fuel economy of 20.6 mpg for GM and 21.5 mpg for Chrysler in 1986.[37] NHTSA considered the possibility of requiring greater gains in fuel economy than it projected Ford would achieve, which would be possible if manufacturers restricted their production of larger trucks. However, based on Ford's predictions, the agency concluded that the effects of requiring a 1.5 mpg improvement would be "beyond the realm of 'economic practicability' as contemplated in the Act."[38]

Although NHTSA projected that Ford, again the least capable manufacturer, could achieve a maximum fuel economy level of 20.4 mpg in 1986, the agency set the combined standard at 20.0 mpg. To justify setting the standard below the levels that it predicted all of the manufacturers could achieve, NHTSA cited data submitted by Ford that indicated Ford's 1986 fuel economy could be as low as 19.6 mpg if consumers maintained a strong demand for larger vehicles. The agency also suggested that GM's planned engine improvements involved technological risks and might be unsuccessful. Finally, the agency relied on the imminence of the 1986

model year, which would prevent the manufacturers from instituting any major technological changes or new programs to compensate for market shifts, and on the decline in the manufacturers' ability to improve fuel economy due to market shifts.[39]

Petitioners Center for Auto Safety and Environmental Policy Institute filed timely petitions for reconsideration with NHTSA. Both petitions challenged NHTSA's reliance on consumer demand as a major factor in setting CAFE standards, which they argue undercuts EPCA's goal of energy conservation. They further alleged that technology permitted greater fuel savings and that the statutorily required "maximum feasible" level of fuel economy is higher than the standard produced by accommodating Ford's capabilities, a practice they dubbed the "lowest common denominator" approach. They urged the agency to require marketing strategies to shift demand and advocated the imposition of penalties, rather than the lowering of standards, when manufacturers fail to comply with the standards. NHTSA denied the petitions for reconsideration[40] and this appeal followed.

## II. STANDING

■ The Center for Auto Safety, Public Citizen and Union of Concerned Scientists claim standing to file a petition for judicial review of the CAFE standards based on the standing of their members, whom these organizations seek to represent in this action.[41] In *Hunt v. Washington State Ap-*

**35.** The 1986 two-wheel and four-wheel drive standards were set at 20.5 and 19.5, respectively. 49 Fed.Reg. 41,250, 41,254 (1984).

**36.** *Id.* at 41,252. NHTSA projected a fuel economy gain due to the introduction of engines using more efficient lean burn/fast burn technologies and to the elimination of the engine calibration effects that lowered fuel efficiency in 1985.

**37.** *Id.*

**38.** *Id.* Ford predicted that in order to achieve a 1.5 mpg benefit in fuel economy, sales losses of 100,000 to 180,000 units with an accompanying loss of 12,000 to 23,000 jobs could occur. It also suggested that sales restrictions on its part

would simply shift consumer demand for large trucks to other manufacturers, with no net gain in fuel economy.

**39.** *Id.* at 41,253.

**40.** 50 Fed.Reg. 11,162 (1985).

**41.** The fourth petitioner, Environmental Policy Institute ("EPI"), sues on its own behalf. EPI is a non-profit organization that works to promote the effectiveness of various fuel-efficiency programs and encourages conservation in the transportation sector. EPI argues that its institutional interests are adversely affected if, under the circumstances here, NHTSA can base fuel economy standards on consumer demand

*ple Advertising Commission,*[42] the Supreme Court enunciated the standing requirements for an organization that seeks to present the claims of its members in a representational capacity:

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[43]

It is undisputed that the petitioner organizations satisfy the second and third prongs of this test. They seek to protect their members' interests in the widest possible choice of the most fuel-efficient vehicles that can be manufactured. These interests are germane to the organizations' purposes, which include promoting energy conservation and the availability of fuel-efficient vehicles. In addition, there is no reason to require individual members of any of the organizations to participate in this case.[44]

Thus, the crux of the standing issue appears to be whether the members of the

---

for less fuel-efficient vehicles. According to EPI, NHTSA's decision sends a message to other agencies that fuel conservation efforts are no longer as important as they once were and thus endangers the effectiveness of other federal programs. *See* Reply Brief for Petitioners at 5 n. 4.

Organizations have standing in their own right if they establish that the organization has suffered an injury-in-fact, *i.e.,* a "concrete and demonstrable injury to the organization's activities." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982). EPI has failed to allege such an injury. However much the rulemaking may have reduced fuel conservation, damage to EPI's commitment to effective energy conservation is not sufficient for standing. *See, e.g., Community Nutrition Institute v. Block,* 698 F.2d 1239, 1253–54 (D.C.Cir.1983) (no organizational standing where petitioner alleges only that it has an interest in "seeing" that consumers receive dairy products at the lowest possible price; organization must allege that the regulation impedes it from assisting consumers to do so), *reversed on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). EPI would have standing only if it alleged injury to its *activities. See Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 937 (D.C.Cir.1986) (appellants "rest their claims on programmatic concerns, not on wholly speculative or purely ideological interests in the agency's action").

Finally, although EPI participated in the rulemaking at the agency level and filed a motion for reconsideration by NHTSA, that participation does not, in and of itself, satisfy *judicial* standing requirements. *See Pittsburgh & West Virginia Ry. Co. v. United States,* 281 U.S. 479, 486, 50 S.Ct. 378, 380, 74 L.Ed. 980 (1930); *accord Chemehuevi Tribe of Indians v. FPC,* 489 F.2d 1207, 1212 n. 12 (D.C.Cir.1973), *vacated on other grounds,* 420 U.S. 395, 95 S.Ct. 1066, 43 L.Ed.2d 279 (1975).

However, because the other petitioners have standing, EPI's lack of standing does not require dismissal of the case. *See, e.g., Watt v. Energy*

*Action Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

**42.** 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also National Treasury Employees Union v. United States Merit Systems Protection Bd.,* 743 F.2d 895, 910 (D.C.Cir.1984).

**43.** 432 U.S. at 343, 97 S.Ct. at 2441; *see also Schweiker v. Gray Panthers,* 453 U.S. 34, 40 & n. 8, 101 S.Ct. 2633, 2638 n. 8, 69 L.Ed.2d 460 (1981) (organization dedicated to helping elderly had standing to challenge Medicaid regulations that "adversely affected" some of its members).

**44.** Courts have required individual participation in circumstances where there are conflicts of interest within the organization or when a specific factual setting is needed to illuminate the issues. *See, e.g., Harris v. McRae,* 448 U.S. 297, 320–21, 100 S.Ct. 2671, 2689–90, 65 L.Ed.2d 784 (1980) (participation of an individual required for standing to advance claim against prohibition of Medicaid funding of abortions when organization members held diverse views concerning abortion and decision to seek an abortion is a matter of individual conscience); *O'Hair v. White,* 675 F.2d 680, 691–92 (5th Cir. 1982) (individual had to assert his own claim that state denied him a right to a fair trial by jury). Courts have also required individual participation in a suit when necessary for damage determinations. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 515–16, 95 S.Ct. 2197, 2213–14, 45 L.Ed.2d 343 (1975) (organization has no standing to request damages on members' behalf when damage claims not common to all members or shared by all in equal degree). None of these circumstances pertain to the claims raised by petitioners in the present case.

petitioner organizations would have standing to sue in their own right.[45] The agency's principal allegation is that the petitioners have suffered no "distinct and palpable" injury [46] because the deleterious effect of lower standards on efforts to improve fuel efficiency and decrease dependence on foreign oil is not an injury peculiar to the petitioners, but is common to the entire society. NHTSA's attempt to analyze the injury as a "generalized grievance" is completely misplaced and, moreover, confuses this prudential principle with the constitutional requirement of injury-in-fact. The petitioners plainly satisfy the Article III prerequisites for standing and Congress, in enacting EPCA, has removed any reason to invoke the restraints on judicial review provided by the prudential principles of the standing doctrine.

## A. Constitutional Requirements

In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,*[47] the Supreme Court summarized the limitations placed on standing by Article III of the Constitution, which restricts the judicial power of the United States to the resolution of "cases" and "controversies:"

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976). In this manner does Art. III limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v.*

---

**45.** As an initial matter, it should be noted that the petitioners did not supply a detailed basis for their members' standing in their petition for review in this court. However, the petitioners provided ample information in their brief and there is no strict pleading requirement for allegations of standing; neither Rule 15 nor Rule 28 of the Federal Rules of Appellate Procedure require strict pleadings of injury.

Moreover, the petitioners' failure to include this information in their petition for review can be excused in this case because the dispute on standing was completely unanticipated. The Government did not object to the standing of the Center for Auto Safety in their previous challenges to CAFE standards. *See Center for Auto Safety v. NHTSA,* 710 F.2d 842 (D.C.Cir. 1983) (challenging NHTSA's withdrawal of an advance notice of a proposed rulemaking that sought information that would have been useful in setting automobile CAFE standards for model year 1985 and henceforth); *Center for Auto Safety v. Claybrook,* 627 F.2d 346 (D.C.Cir.1980) (challenging NHTSA's decision to exempt certain manufacturers from automobile CAFE standards). Nor has the Government challenged the petitioners' standing to request review of other NHTSA standards and of actions by the Department of Transportation. *See Center for Auto Safety v. Peck,* 751 F.2d 1336 (D.C. Cir.1985) (bumper standards); *Public Citizen v. Steed,* 733 F.2d 93 (D.C.Cir.1984) (tire quality grading standards); *Center for Auto Safety v. Lewis,* 685 F.2d 656 (D.C.Cir.1982) (settlement of investigation of safety defect); *Pacific Legal Found v. Department of Transportation,* 593 F.2d 1338 (D.C.Cir.) (delayed implementation of requirement for air bags), *cert. denied,* 444 U.S. 830, 100 S.Ct. 57, 62 L.Ed.2d 38 (1979); *Nader v. Volpe,* 466 F.2d 261 (D.C.Cir.1972) (elimination of requirement for passive restraint systems).

In addition, in *Natural Resources Defense Council, Inc. v. Herrington,* 768 F.2d 1355 (D.C. Cir.1985), this court recently reached the merits, without any hint of standing difficulty, in a challenge to the Department of Energy's final rules determining that mandatory energy-efficiency standards were not justified for eight types of household appliances. These rules were promulgated pursuant to EPCA's energy conservation program for consumer products other than automobiles, and challenged by consumer groups and several states under the authority of 42 U.S.C. § 6306(b) (1982), which allows "[a]ny person who will be adversely affected by a rule prescribed under section 6293, 6294, or 6295 of this title when it is effective" to file a petition for review.

**46.** *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**47.** 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

*Cohen,* 392 U.S., [83] at 97 [88 S.Ct. 1924, 1951, 20 L.Ed.2d 947].[48]

### 1. *Injury-in-Fact*

■ The prevailing case law teaches that the first prong of the Article III standing requirements—injury-in-fact—is satisfied by the presence of a "distinct and palpable injury." [49] The injury can be found in the invasion of a statutory right, created by Congress.[50] It need not be economic and may encompass a wide range of concerns,[51]

but an injury to merely "abstract" interests will not suffice.[52] Nor is it enough to simply assert that the government must be administered according to law.[53] There is, however, no requirement that the injury be important or large; an "identifiable trifle" can meet the constitutional minimum.[54] The injury need not have already occurred; it is sufficient if it is "actual" or "threatened." [55] And an injury shared by a large number of people is nonetheless an injury.[56]

**48.** *Id.* at 472, 102 S.Ct. at 758 (footnote omitted).

**49.** *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**50.** *See, e.g., Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 224 n. 14, 94 S.Ct. 2925, 2933 n. 14, 41 L.Ed.2d 706 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 493 n. 2, 94 S.Ct. 669, 675 n. 2, 38 L.Ed.2d 674 (1974); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n. 3, 35 L.Ed.2d 536 (1973); *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212 (1972) (White, J., concurring); *Sierra Club v. Morton,* 405 U.S. 727, 732 & n. 3, 92 S.Ct. 1361, 1364 n. 3, 31 L.Ed.2d 636 (1972); *Association of Data Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 152, 71 S.Ct. 624, 638, 95 L.Ed.2d 817 (1951) (Frankfurter, J., concurring).

**51.** *See United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"),* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972); *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1007 (D.C.Cir.1977) (injury to "recreational, aesthetic, scientific, and educational interests" of members), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978).

**52.** *See, e.g., Diamond v. Charles,* —— U.S. ——, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (pediatrician's concern with the standards of medical practice for abortions an abstract interest that does not support standing to challenge a state abortion law); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 39–40, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976) (organization's general interests in health problems of the poor an "abstract concern" that will not support standing); *Sierra Club v. Morton,* 405 U.S. at 739–40, 92 S.Ct. at 1368–69 (interest in conservation not enough where no injury alleged to organization's members); *United Presbyterian*

*Church v. Reagan,* 738 F.2d 1375, 1378–80 (D.C. Cir.1984) (chilling effect of fear of illegal surveillance not a concrete injury sufficient to provide standing to challenge Executive Order establishing framework for governmental intelligence gathering); *Capital Legal Found v. Commodity Credit Corp.,* 711 F.2d 253 (D.C.Cir.1983) (interest in monetary effects not enough to create injury from assumption of debts of obligors in Poland).

**53.** *See, e.g., Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984); *Valley Forge,* 454 U.S. at 482–87, 102 S.Ct. at 763–67.

**54.** *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973).

**55.** *See, e.g., Heckler v. Mathews,* 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984); *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758; *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205; *American Friends Serv. Comm. v. Webster,* 720 F.2d 29, 46–47 & n. 24 (D.C.Cir.1983) (standing to challenge FBI document disposal practices accorded plaintiffs desiring access to documents for research and for legal challenges to governmental activities, who would be injured if documents destroyed); *Ludlow Corp. v. SEC,* 604 F.2d 704, 706 (D.C.Cir.1979) (issuer of stock has standing to challenge SEC order permitting unlisted trading of the stock, which "might destabilize" trading and impair issuer's future ability to raise capital); *Southern Mutual Help Ass'n, Inc. v. Califano,* 574 F.2d 518, 523–24 (D.C.Cir.1977) (standing for grantee whose future ability to get grants endangered by damage to reputation); *Buckley v. Valeo,* 519 F.2d 821, 871 n. 130 (D.C. Cir.1975) (en banc) (organization asserting that disclosure of identity of contributors would cause loss of contributions had standing to challenge disclosure requirements of Federal Election Campaign Act), *aff'd in relevant part,* 424 U.S. 1, 12 & n. 11, 96 S.Ct. 612, 631 n. 11, 46 L.Ed.2d 659 (1976).

**56.** *See Sierra Club v. Morton,* 405 U.S. at 734, 92 S.Ct. at 1366 ("[T]he fact that particular environ-

The Center for Auto Safety alleges an injury to its members, who are interested in purchasing the most fuel-efficient vehicles possible: NHTSA's low CAFE standards will diminish the types of fuel-efficient vehicles and options available. Without the threat of civil penalties, manufacturers will not be prodded to install as many fuel-saving devices, nor to install them as promptly. As a result, petitioners' members will have less opportunity to purchase fuel-efficient light trucks than would otherwise be available to them. In addition, the petitioners urge that NHTSA's action sends an instant message that standards will be altered to accommodate manufacturers' marketing plans. Such a message can only retard the current development of new technologies that would make even greater fuel savings possible in the future.

The Government argues that the petitioners' members will not be injured in this fashion. They maintain that the most fuel-efficient vehicles possible are already being manufactured and that, because it is the average fuel economy of a manufacturer's fleet that must meet the standards, rather than that of each individual car, the agency's action does nothing to reduce the range of vehicles or options available for purchase. This position is belied by the record, especially with respect to the capabilities of Ford to install additional technol-

ogy and adjust their engines to achieve greater fuel economy.

For example, one reason cited by NHTSA to support lowering its projections of Ford's fuel economy achievements is that Ford adjusted the engine performance of its light trucks in a way which lowered the fuel economy of the vehicles.[57] This demonstrates that merely by means of a readjustment, and without any additional hardware, Ford could have increased fuel efficiency. In addition, the data supporting the agency calculations reveal that not all the technology available to Ford was incorporated to the fullest extent possible.[58] Two small displacement engines, which NHTSA had predicted would be installed in over 80% of Ford's F-150 standard light pickups, were dropped by Ford due to "low consumer acceptance" and are no longer available as options.[59] Moreover, the implication that Ford has already incorporated all the possible technology into its vehicles is belied by a comparison of its fuel economy levels to those projected for GM. Ford's counsel explained at oral argument that Chrysler's fuel economy projections are higher than Ford's largely because of differences in the *mix* of vehicles the two manufacturers produce, *i.e.*, Ford's fleet contains a greater proportion of *larger* light trucks. However, he conceded that GM's projections were more favorable than

mental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."); *SCRAP*, 412 U.S. at 687, 93 S.Ct. at 2416 ("[S]tanding is not to be denied simply because many people suffer the same injury."); *accord Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206.

**57.** One of the reasons that NHTSA lowered its prediction for Ford's model year 1985 fuel economy was an engine calibration Ford made to improve performance coincident with meeting more stringent EPA emission requirements. This calibration accounted for a reduction of 0.2 mpg in the 1985 CAFE standard. *See* 49 Fed. Reg. 41,250, 41,252 (1984). Ford argued that the EPA emission standards, which took effect in 1984, had reduced its light truck fuel economy by 0.3 to 0.4 mpg. *See* 49 Fed.Reg. 22,516, 22,518 (1984). However, both EPA and NHTSA agreed that there is no inherent fuel economy loss due to the EPA standards. *See* 49 Fed.Reg.

41,250, 41,252–53 (1984). NHTSA concluded that the 0.2 mpg loss was due instead to adjustments of electronic engine control systems to improve light truck "driveability." It stated that "light truck manufacturers have not optimized their engine/exhaust emission control systems for fuel economy." Final Rule Technical Supplement to Regulatory Impact Analysis for Proposed Light Truck Fuel Economy Standards Model Year 1985, at 13, FE–84–01–N02–005 (July, 1984), *reprinted in* J.A. 322 [hereinafter 1985 Final Technical Supplement].

**58.** NHTSA noted losses in Ford's projected model year 1985 fuel economy due to a lack of lockup clutches on its three-speed automatic transmission and a decrease in the application of four- and five-speed manual transmissions. 1985 Final Technical Supplement at 16.

**59.** *Id.* at 7.

Ford's *not* because of vehicle mix, but due to a greater financial capability to develop more advanced technology.[60]

In addition, the problem is not limited to the fact that Ford lags technologically. By tailoring the standards to Ford's capabilities and setting them below the levels projected for GM and Chrysler,[61] the agency provides a disincentive for the other manufacturers to produce the most fuel-efficient vehicles possible. Manufacturers may be capable of improvements, but they are unlikely to add any technology not necessary to meet the CAFE standards, if those improvements will increase the cost of a vehicle and put them at a competitive disadvantage.[62] Such disincentives may be *permissible*, but that is a question to be determined on the merits. Even if within agency discretion, this agency action nonetheless creates an injury.

The Government also argues that the manufacturers establish their designs for a given model year so far in advance that lowering the 1985 requirement at the start of the model year and setting the 1986 standards only a year before the start of that model year will have no deleterious effect on the technology available in the vehicles. This argument completely overlooks the statutory scheme by which manufacturers earn credits for achieving fuel economy levels in excess of the standard. Because these credits can be carried forward for three years to offset penalties,[63] an impermissibly low standard set for any given year reduces improvements in fuel efficiency in the future. Moreover, NHTSA has exacerbated these effects by setting the 1986 light truck CAFE standards *below* the fuel economy level it predicts even Ford will be able to achieve.[64] Thus, the agency has built credits into the standard; credits which will be used to offset penalties and thus permit the production of less fuel-efficient vehicles in future years. Therefore, even if the standards at issue here were to have no immediate effect on the availability of fuel-efficient vehicles, eventually the light trucks available for purchase by the petitioners' members will be less fuel efficient than would be the case with higher 1985 and 1986 model year standards.

Finally, NHTSA seeks to have this court reject the petitioners' claims of injury as "generalized grievances" because so many people share in the injury. This argument

---

**60.** In addition, counsel for Ford admitted that a Ford truck is possibly less fuel-efficient than a GM truck of comparable weight.

Ford's position is that it has made all the technological improvements that the agency projected in 1980. *See* 49 Fed.Reg. 22,516, 22,-517 (1984). This argument, however, is irrelevant to the question of the petitioners' injury. If Ford has not incorporated all the technology *possible*, regardless of *projections* made five years previously, then a higher standard will lead to higher average fuel economy and the availability of vehicles that are more fuel-efficient.

**61.** NHTSA projected that GM and Chrysler could achieve combined fuel economy levels of 20.0 mpg and 20.3 mpg, respectively, for model year 1985, but set the combined standard at 19.5 mpg. For model year 1986, GM and Chrysler projections were 20.6 mpg and 21.5 mpg, respectively, compared to a combined light truck CAFE standard of 20.0 mpg. 49 Fed.Reg. 41,-250, 41,252 (1984).

**62.** Chrysler's reaction to Ford's request for lower model year 1984 and 1985 standards is illustrative:

Chrysler is particularly concerned with this rulemaking because of the harm to the corporation if the petitioners' request is granted. *Any reduction in 1984 or 1985 model year light truck standards will waste the investments made by Chrysler and other manufacturers to meet the requirements of the law.* Our commitment to car and truck fuel economy has caused us to limit model availability, options and engine sizes. Because of meeting the standards, we estimate we are losing $300 million in profits every year. In addition, lower standards would allow petitioner to compete unfairly against our products in the future. Money which would have gone for fines can be used by petitioner for new product development which will continue to hurt our sales.

1985 Final Technical Supplement at 18–19 (emphasis added).

**63.** *See* 15 U.S.C. § 2002(*l*) (1982).

**64.** *See* 49 Fed.Reg. 41,250, 41,253 (1984).

is completely misplaced. As this court has recently stated:

It is settled law that standing may be grounded on a mere "trifle;" settled, too, that the widespread character of an alleged injury does not demean the standing of those who are in fact injured.[65]

The question of *how many suffer* from an injury is logically unrelated to the question of *whether there is* an injury and has nothing to do at all with the fitness of a particular party to bring a claim. There is abundant precedent that makes it plain that the widespread nature of a harm is irrelevant to the Article III standing requirement of injury.[66]

The petitioners in the instant case have alleged a distinct injury to their members. The only *conceivable* argument based on "generalized grievances" that NHTSA may advance relates to prudential principles. As will be shown in part B below, this so-called "prudential" concern in no way defeats standing in this case.

### 2. *"Fairly Traceable" and "Redressibility" Components*

The "fairly traceable" and "redressibility" requirements for Article III standing ensure that the injury is caused by the challenged action and can be remedied by judicial relief.[67] When, as in this case, the relief requested is simply the cessation of illegal conduct, the Court has noted that the "fairly traceable" and "redressibility" analyses are identical.[68]

NHTSA argues that the petitioners' claims are not redressible because this court's decision comes after the close of the 1985 model year and after the start of the 1986 model year. Because vehicle designs are determined far in advance of a model year, the agency contends that any decision would have no practical effect on the types of vehicles available. This argument has no merit whatsoever given the penalties that may be assessed, or the credits forgone, with a favorable decision from this court. As discussed above, EPCA's system of penalties, coupled with credits that can be carried forward or backward three years, serves to force manufacturers to make improvements in the future if they fail to make them in the present.

Moreover, in arguing that any remedy would come too late, the agency has confused mootness with standing. The standing inquiry is designed to determine if the *party* may appropriately assert a claim, while mootness is concerned with the appropriate *timing* of the claim. While the two concepts are related,[69] the credits and penalties implicated here clearly mean that there is no cognizable mootness claim in this case.

There is no difficulty in linking the petitioners' injury to the challenged agency action. NHTSA sets standards for the purpose of making vehicles more fuel-efficient, which are enforced by penalties levied on manufacturers who do not comply with the regulations. The petitioners, in turn, complain of less fuel-efficient vehicles. The object of the agency's regulation and the injury are thus directly linked. If setting a higher standard cannot result in vehicles with increased fuel efficiency, then the en-

---

**65.** *Common Cause v. Doe,* 702 F.2d 245, 251 (D.C.Cir.1983) (footnotes omitted).

**66.** *See, e.g., Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206; *SCRAP,* 412 U.S. at 687, 93 S.Ct. at 2415; *Sierra Club v. Morton,* 405 U.S. at 734, 92 S.Ct. at 1365; *Community Nutrition,* 698 F.2d at 1251; *Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1007 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978).

**67.** The Supreme Court has noted that the two requirements were

initially articulated ... as "two facets of a single causation requirement." To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested.

*Allen v. Wright,* — U.S. —, 104 S.Ct. 3315, 3326 n. 19, 82 L.Ed.2d 556 (1984) (quoting C. WRIGHT, LAW OF FEDERAL COURTS § 13, at 68 n. 43 (4th ed. 1983)).

**68.** *See id.* 104 S.Ct. at 3329 n. 24.

**69.** *See International Union of Bricklayers v. Meese,* 761 F.2d 798, 805 (D.C.Cir.1985).

tire regulatory scheme is pointless. In sum, this case involves none of the multiple, tenuous links between challenged conduct and asserted injury that have characterized claims in which causation has been found lacking.[70]

## B. *Prudential Requirements*

In addition to the constitutional minimum for standing imposed by Article III, the courts also have required plaintiffs to qualify under a set of prudential principles, recently summarized by the Supreme Court as follows:

> "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S., at 499 [95 S.Ct. at 2205]. In addition, even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. *Id.*, at 499–500 [95 S.Ct. at 2205–06]. Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Process-*

*ing Service Orgs. v. Camp*, 397 U.S. 150, 153 [90 S.Ct. 827, 830, 25 L.Ed.2d 184] (1970).[71]

The Government does not contend that the petitioners seek to represent third parties or that their claims fall outside the "zone of interests" protected by EPCA. Rather, NHTSA's objection centers on the second prudential requirement and it attempts to characterize the issues raised by the petitioners as "generalized grievances." This attempt is patently futile because, even if the petitioners' claims could be properly labeled as generalized grievances, Congress has eliminated all prudential limitations on standing to bring these claims.

■ It is plain that, unlike the Article III requirements, the prudential limitations on standing are subject to elimination by Congress.

Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one "who otherwise would be barred by prudential standing rules." *Warth v. Seldin*, 422 U.S., at 501 [95 S.Ct. at 2206]. In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself," *ibid.*,

---

**70.** In *Allen v. Wright*, for instance, the Court found that an injury to parents' abilities to have their community schools desegregated was not fairly traceable to IRS tax exemptions to racially discriminatory schools. The Court reasoned that the chain of causation depended on the uncertain responses of numerous third parties to the IRS action. The diminished ability to receive a desegregated education would be linked to the tax exemption only if (1) there were a sufficient number of private schools in the community for withdrawal of the exemption to make a difference in integration, (2) withdrawal of the exemption would cause a private school to change its policies, and (3) a given parent would transfer a child to public school if discriminatory policies were changed. Moreover, these "independent decisions may not collectively have a significant effect on the ability of public-school students to receive a desegregated education." 104 S.Ct. at 3329. *See also Simon v. Eastern Kentucky Welfare Rights Org.,*

426 U.S. 26, 40–46, 96 S.Ct. 1917, 1925–28, 48 L.Ed.2d 450 (1976) (no causal connection between hospital's tax-exempt status and its policy on medical care for indigents); *California Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823 (D.C.Cir.1985) (no causal connection between FCC's use of "short form" rather than "long form" application to transfer control of stock in an owner of television stations and alleged injury from owner's failure to provide captioning for the hearing impaired and to hire handicapped); *Von Aulock v. Smith*, 720 F.2d 176 (D.C.Cir.1983) (no standing to challenge EEOC interpretive ruling that plaintiffs alleged authorized their employers to maintain pension plans allegedly discriminating on the basis of age when plans were a result of employers' independent action that predated the ruling).

**71.** *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. at 759–60 (footnotes omitted).

that is likely to be redressed if the requested relief is granted.[72] Congress has frequently exercised this perogative, most commonly in statutes that involve civil rights, consumer issues or environmental interests.[73]

■ The broad standing to challenge CAFE standards established by EPCA removes any necessity to limit judicial review for prudential reasons. Petitions for judicial review may be filed by "[a]ny person who may be adversely affected by any rule prescribed under section 2001, 2002, 2003 or 2006 of this title."[74] As explained in the Conference Report, this provision authorizes review of any rule prescribed under NHTSA's authority "to define terms and to establish, modify, or amend average fuel economy standards," and under EPA's authority "to determine average fuel economy and to require labeling of new automobiles."[75]

Congress' choice of the criterion "may be adversely affected" to determine standing for judicial review of CAFE standards places EPCA alongside numerous statutes employing similar language,[76] which courts have construed as granting broad standing. For example, the Federal Communications Act bestows standing on a person "aggrieved or whose interests are adversely affected."[77] In *FCC v. Sanders Brothers Radio Station*,[78] one of the first cases to acknowledge a generous statutory grant of standing to review administrative action, the Supreme Court held that this provision authorized a plaintiff to seek review of a FCC grant of a radio station license to a competitor. Competitive interests were not protected by either common law or the statute,[79] but the injury was nonetheless sufficient to allow the petitioner to challenge the license grant as a representative of the public interest.[80] Listeners and viewers can also challenge license renewals under this standing provision.[81]

In many cases, courts have specifically interpreted such language as expanding standing to the limits of Article III and completely eliminating prudential inquiry. The premier example is provided by the Fair Housing Act of 1968, which gives standing to "[a]ny person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured by a discriminatory housing practice that is about to occur (hereafter 'person aggrieved')."[82] The Supreme Court read this language to extend standing to enforce the statute " 'to the full limits of Art. III' " with the consequence that "courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section."[83] Thus, standing has been held ap-

**72.** *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *see also Bread Political Action Comm. v. FEC*, 455 U.S. 577, 584, 102 S.Ct. 1235, 1239, 71 L.Ed.2d 432 (1982); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982); *United States v. Richardson*, 418 U.S. at 178 n. 11.

**73.** *See, e.g.*, C. Wright, A. Miller & E. Cooper, 13A Federal Practice and Procedure § 3531.13, at 69 & nn. 8–10 (2d ed. 1984).

**74.** 15 U.S.C. § 2004(a) (1982). CAFE standards for light trucks are prescribed pursuant to section 2002.

**75.** S.Rep. No. 516, 94th Cong., 1st Sess. 158 (1975) [hereinafter Conference Report], U.S. Code Cong. & Admin.News 1975, pp. 1762, 1999.

**76.** *See* Scott, *Standing in the Supreme Court—A Functional Analysis*, 86 Harv.L.Rev. 645, 655 n.

34 (1973) ("The broadest, and most common, formulation is phrased in terms of 'any party in interest' or 'any person aggrieved' or 'adversely affected.' ").

**77.** 47 U.S.C. § 402(b)(6) (1982).

**78.** 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 1037 (1940).

**79.** *Id.* at 475, 60 S.Ct. at 697.

**80.** *Id.* at 476–77, 60 S.Ct. at 698–99.

**81.** *See Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994 (D.C.Cir. 1966).

**82.** 42 U.S.C. § 3610(a) (1982).

**83.** *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1978) (quoting *Gladstone, Realtors v. Village of*

propriate for those alleging an injury to their interest in the "benefits from interracial associations" [84] and to the "legal right to truthful information about available housing." [85] This circuit has similarly held that generous statutory standing grants, using a variety of language, expand standing as broadly as Article III permits.[86]

EPCA clearly removes the judicial authority to create prudential barriers by granting review of agency action to those "who may be adversely affected." The injuries alleged by the petitioners certainly place them in that category. Members of Center for Auto Safety and the other petitioners are part of a group of vehicle owners who wish to buy fuel-efficient light trucks. Because the NHTSA standards injure their ability to do so, they are plainly "adversely affected."

Once Congress has extended standing to a broad group of petitioners, concerns for maintaining separation of powers should no longer restrain judicial review. It would make no sense to deny standing under a principle designed to prevent the courts from encroaching on the legislature's domain when Congress itself has already "weighed the need for and the value of judicial review of a given category of ad-

ministrative decisions, and has decided it is warranted." [87] In the words of Justice Powell,

> objections to public actions are ameliorated by the congressional mandate. Specific statutory grants of standing in such cases alleviate the conditions that make "judicial forbearance the part of wisdom." [88]

When Congress has conferred standing, it matters not one iota if a large number of people share the injury and would benefit from its redress. The courts may appropriately function as the guardians of majority interests, without weakening the separation of powers, when Congress has decided to grant them that role. Indeed, far from *preserving* the separation of powers, when Congress has spoken, the courts place themselves in conflict with the legislative branch if they *ignore* the statutory message.

In sum, it must be concluded that petitioners Center for Auto Safety, Public Citizen and Union of Concerned Scientists satisfy the constitutional requirements for standing. Because EPCA grants standing to a broad group of beneficiaries of the statute's programs to conserve fuel, the

---

*Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979)).

**84.** *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *see also Gladstone,* 441 U.S. at 111–14, 99 S.Ct. at 1613–15.

**85.** *Havens Realty Corp. v. Coleman,* 455 U.S. at 373, 102 S.Ct. at 1121.

**86.** *See, e.g., Consumers Union v. FTC,* 691 F.2d 575, 576 (D.C.Cir.1982) (en banc) (per curiam) (Federal Trade Commission Improvements Act of 1980 authorizes "[a]ny interested party" to challenge the legislative veto provisions of the statute, 15 U.S.C. § 57a–1(f)(1) (1982); "It is undisputed that Congress, through the '[a]ny interested party' specification, intended to permit standing to seek judicial review to the full extent permitted by Article III."), *aff'd,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402–03 (1983); *Gray v. Greyhound Lines, East,* 545 F.2d 169, 176 (D.C.Cir.1976) (Although they had been hired, Black employees had standing to complain of discriminatory hiring practices in violation of Title VII, which confers standing as

broadly as is permitted by Article III with the language "a person claiming to be aggrieved," 42 U.S.C. § 2000e–5(b) (1982)).

In other cases, while not explicitly holding that Congress eliminated prudential inquiries, this court has interpreted generous statutory provisions to grant broad standing. *See, e.g., Animal Welfare Inst. v. Kreps,* 561 F.2d 1002, 1005 (D.C.Cir.1977) (provision of Marine Mammal Protection Act granting standing to "any party opposed to [an import] permit," 16 U.S.C. § 1374(d) (1982), applicable as well to challenge to waiver of moratorium on imports of baby seal-skins), *cert. denied,* 434 U.S. 1013 (1978); *Metropolitan Washington Coalition for Clean Air v. District of Columbia,* 511 F.2d 809, 814 & n. 26 (D.C.Cir.1975) ("any citizen" may bring an action against a pollutor under the Clean Air Act, 42 U.S.C. § 1857h–2 (1982)).

**87.** Scott, *supra* note 76, at 656.

**88.** *United States v. Richardson,* 418 U.S. 166, 196 n. 18, 94 S.Ct. 2940, 2956 n. 18, 41 L.Ed.2d 678 (1974) (Powell, J., concurring) (quoting *Flast v. Cohen,* 392 U.S. 83, 132, 88 S.Ct. 1942, 1969, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting)).

judicial principle restricting review of so-called "generalized grievances" is inapplicable. There is thus no need to determine the precise boundaries of the concept of generalized grievance, a matter that courts have found troublesome.[89] Instead, Congress has eliminated the inquiry completely.

### III. MERITS

■ A two step analysis is required in reviewing whether NHTSA gave impermissible weight to shifts in consumer demand in setting the 1985 and 1986 model year light truck CAFE standards. The first inquiry is "whether Congress has directly spoken to the precise question at issue."[90] Because it appears that it has not, this court must inquire further and assess whether the agency's interpretation of the statute "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute."[91] The agency's interpretation of the statutory requirements is due considerable deference and must be found adequate if it falls within the range of permissible constructions.[92]

■ Congress delegated the determination of fuel economy standards to the Secretary, who in turn assigned this task to NHTSA. On its face, the statute gives the agency discretion to designate the classes of light trucks subject to standards. It then requires the standards to be set at the "maximum feasible" level and outlines four general categories of factors to be considered in making that determination. Consumer demand is not specifically designated as a factor, but neither is it excluded from consideration; the factors of "technological feasibility" and "economic practicability" are each broad enough to encompass the concept. Thus, the unadorned language of the statute does not indicate a congressional intent concerning the precise objections raised by the petitioners.

The legislative history of EPCA is similarly unilluminating. Congress clearly contemplated that consumers would benefit from the flexibility accorded to the manufacturer by a system of fuel economy standards, which the Senate Report predicted "should result in a more diverse product mix and wide consumer choice."[93] The Conference Report states that the fuel economy standards delegated to NHTSA are to be the product of balancing the benefits of higher fuel economy levels against the difficulties individual manufacturers would face in achieving those levels:

> Such determination should take industry-wide considerations into account. For example, a determination of maximum feasible average fuel economy should not be keyed to the single manufacturer which might have the most difficulty achieving a given level of average fuel economy. Rather, the Secretary must weigh the benefits to the nation of a higher average fuel economy standard against the difficulties of individual automobile manufacturers. Such difficulties, however, should be given appropriate weight in setting the standard in light of the small number of domestic automobile manufacturers that currently exist, and the possible implications for the national economy and for reduced competition association [sic] with a severe strain on any manufacturer. However, it should also be noted that provision has been made for granting relief from penalties under Section 508(b) in situations where competition will suffer significantly if penalties are imposed.[94]

**89.** See, e.g., Community Nutrition, 698 F.2d at 1251 & n. 74.

**90.** Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

**91.** Id. at 845, 104 S.Ct. at 2784 (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

**92.** See Office of Consumers' Counsel v. FERC, 783 F.2d 206, 218 (D.C.Cir.1986).

**93.** Senate Report, supra note 8, at 6.

**94.** Conference Report, supra note 75, at 154–55, U.S.Code Cong & Admin.News 1975, pp. 1995, 1996.

Again, this language neither precludes nor requires lower standards when consumer demand for heavy vehicles is strong. The agency is directed to weigh the "difficulties of individual automobile manufacturers;" there is no reason to conclude that difficulties due to consumer demand for a certain mix of vehicles should be excluded.

The petitioners correctly observe that Congress rejected both the President's proposed energy program, which relied on market mechanisms to reduce demand as prices rose,[95] and the President's fuel economy program, which depended on voluntary improvements by vehicle manufacturers.[96] Instead, Congress created mandatory vehicle fuel economy standards, intended to be technology forcing, with the recognition that "market forces ... may not be strong enough to bring about the necessary fuel conservation which a national energy policy demands."[97] However, while Congress rejected market forces as the *sole* means of improving energy conservation, that does not then mean that consumer demand is *irrelevant* to the determination of the mandatory standards.

The petitioners also argue that the history of congressional action on the penalty provisions of the Act indicates that shifts in consumer demand cannot be a valid reason to set standards at lower levels. The Act contains two provisions originally included in both the House and Senate bills, which allow waiver of penalties to prevent insolvency or if non-compliance was due to an Act of God, strike or fire. A third reason for waiver—FTC certification of a substantial lessening of competition—was added by the Conference Committee from the

Senate bill. However, a provision in the Senate bill that would have excused payment of penalties if the manufacturer could show that non-compliance "resulted from an unanticipated retail sales mix among different classes of automobiles or light duty trucks, as appropriate, manufactured by it and that such mix was beyond the control of the manufacturer"[98] was *not* included in the final version. The petitioners conclude that Congress expressly contemplated the present high demand for less fuel-efficient vehicles and rejected such consumer preference as a reason for relief from *penalties*. Therefore, they argue, *a fortiori*, NHTSA cannot rely on shifts in consumer demand as a valid reason to set lower *standards* with the result that no manufacturer will have to pay a penalty.

This *a fortiori* argument rests on the plainly unfounded assumption that the rationales for waiving penalties and the factors to be applied in setting standards are identical. EPCA designates three specific circumstances in which penalties may be waived. Those precisely defined conditions are not at all congruent with the four general categories of factors that go into determining the "maximum feasible" level for a CAFE standard: technological feasibility, economic practicability, effects of other federal motor vehicle standards, and the need for energy conservation. Moreover, the standards and the penalty waivers serve profoundly different functions and hence do not stem from identical concerns. Standards have an industry-wide effect and must take account of industry-wide concerns. Penalty waivers, on the other hand, provide relief to a single manu-

---

**95.** *See* House Report, *supra* note 8, at 4.

**96.** *See Automobile Fuel Economy and Research and Development, Hearings on S. 307, S. 499, S. 633, and Amendment 15, S. 654, and S. 783 before the Senate Comm. on Commerce,* 94th Cong., 1st Sess. 103–05 (1975); *Energy Conservation and Oil Policy, Hearings on H.R. 2633, H.R. 2650 and 2151 before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce,* 94th Cong., 1st Sess. 1373–75 (1975).

**97.** Senate Report, *supra* note 8, at 9.

**98.** *Id.* at 44. This waiver would have applied only if the manufacturer could show it had made "all of the improvements to increase fuel economy that were technologically feasible, and that it made a good faith effort to produce or stimulate a retail sales mix that would have resulted in compliance with the applicable standards, through advertising, pricing practices, availability of models, and any other means." *Id.*

facturer. The factors involved in the two considerations are not completely unrelated, of course,[99] but the petitioners offer no reason why consumer choice cannot be an element of standard setting even though Congress rejected it as a reason to waive penalties. We conclude that the legislative history reveals no precise congressional intent with regard to this issue.[100]

The agency's practice in the past is likewise not determinative of congressional intent. NHTSA and the intervenors argue that the agency has consistently relied on market demand as a factor in setting standards and that Congress was informed of this policy by annual reports and rulemakings,[101] yet failed to alter agency practice when it amended the Act in 1980. However, the petitioners do not challenge the consideration of consumer demand *per se*, but rather the weight the agency has given the factor in downgrading standards when, they argue, the principal impracticability is paying a civil penalty. Until the model years at issue here, there has been little tension between consumer demand and the fuel conservation goals of EPCA. The agency now relies on market projections in a setting in which falling gas prices have relaxed consumer demand for fuel efficiency. Earlier consideration of consumer demand in setting standards could not have alerted Congress to the agency's current application of this factor. Because Congress has not spoken clearly on the issue before us, it must be determined whether the agency's interpretation represents a reasonable accommodation of the policies embodied in the statute.

It is axiomatic that Congress intended energy conservation to be a long term effort that would continue through temporary improvements in energy availability.[102] Thus, it would clearly be impermissible for NHTSA to rely on consumer demand to such an extent that it ignored the overarching goal of fuel conservation. At the other extreme, a standard with harsh economic consequences for the auto industry also would represent an unreasonable balancing of EPCA's policies.

The agency concluded that if manufacturers had to restrict the availability of larger trucks and engines in order to adhere to CAFE standards, the effects "would go beyond the realm of 'economic practicability' as contemplated in the Act."[103] The original projections of tech-

99. For example, the Conference Report makes it plain that one "industry-wide concern" is the reduced competition associated with severe strain on any single manufacturer. However, the ramifications of any particular standard on competition must be considered in light of the penalty waiver provision that offers relief if competition will "suffer significantly." *See* Conference Report, *supra* note 75, at 155, U.S.Code Cong. & Admin.News 1975, p. 1996.

100. The ambiguity of the legislative history is underlined by the fact that each intervenor reads it to suggest a different reason for Congress' omission of the penalty waiver provision.

The original Senate bill required issuance of all amendments to the CAFE standards 18 months prior to the start of the model year at issue, while the final Act requires this lead time only if the standard is made more stringent by the amendment. *Compare* S. 1883, 94th Cong., 1st Sess. § 504(a)(6) (1975), *reprinted in* Senate Report, *supra* note 8, at 39, *with* 15 U.S.C. § 2002(f)(2) (1982). Ford argues that Congress added this more flexible ability to amend the standards as a substitute for the penalty waiver, in order to more effectively take industry-wide concerns into account.

The Automobile Importers of America and GM, on the other hand, suggest that Congress dropped the Senate bill's penalty waiver and retained the House bill's listing of factors to be considered in setting standards because it wanted to consider consumer demand "up front" in setting standards rather than after the end of the model year in waiving penalties.

101. NHTSA cites the amendment to the 1981 model year standard for two-wheel drive light trucks that reduced the CAFE standard from 18 mpg to 17.2 mpg. The amendment was made after NHTSA found that Chrysler's fuel economy capability had been reduced, partly due to an adverse "mix shift" toward demand for heavy, less fuel-efficient options on Chrysler products. 44 Fed.Reg. 36,975, 36,976 (1979).

102. *See, e.g.,* House Report, *supra* note 8, at 3 ("[W]e do not have the potential of making ourselves fully energy-independent in the next ten to twenty years. [This goal] is simply not attainable in the near-term....").

103. 49 Fed.Reg. 41,250, 41,252 (1984).

nological feasibility for the 1985 model year standards were based on the assumption that gasoline prices would remain high and consumer demand for fuel-efficient vehicles would remain strong. No one disputes that actual circumstances have deviated from these assumptions. NHTSA acted within the reasonable range of interpretations of the statute in correcting the 1985 standards to account for these changed conditions. Consideration of product mix effects was also reasonable in setting the standards for 1986, as there is no evidence that the same trends in consumer demand will not continue.

The petitioners argue that NHTSA should not lower the standards in an effort to prevent the least capable manufacturer from falling into noncompliance and paying penalties, because the penalties are meant to provide incentives similar to those provided by a tax. They reason that manufacturers will have an incentive to install fuel-efficient equipment or pursue fuel-efficient developments if the cost is less than the penalty the manufacturers would otherwise incur. In addition, if manufacturers pass the cost of penalties on to consumers who purchase vehicles with low fuel efficiency, the penalties will act to shift consumer demand. The agency's "least common denominator" approach to standard setting removes these incentives.

This aspect of the challenge to the agency's interpretation of the role of EPCA's penalties has already been settled. In *Center for Auto Safety v. Claybrook*,[104] the petitioners argued that in considering the "economic practicability" of a CAFE standard, NHTSA should determine a manufacturer's ability to absorb the fines and then impose penalties to provide the desired incentives. The court disagreed, finding that NHTSA's rejection of this methodology was not contrary to EPCA; the same conclusion obtains in the current setting.

In short, while it may be disheartening to witness the erosion of fuel conservation measures in the face of changes in consumer priorities, this court is nonetheless compelled to uphold the agency's standards. They are the result of a balancing process specifically committed to the agency by Congress, and, in this case, the weight given to consumer demand was not outside the range permitted by EPCA.

### IV. CONCLUSION

It is clear that the petitioner organizations have standing to bring this suit in a representative capacity for their members. Their members have suffered an injury-in-fact, redressible by this court, which is due to the agency's action. The Government's challenge to petitioners' standing under the rubric of "generalized grievance" is inapposite; Congress removed this court's concern for such prudential principles by enacting a broad standing provision as a part of EPCA.

On the merits, however, it must be concluded that NHTSA's consideration of the adverse effects of consumer demand on the fuel economy levels manufacturers can achieve is permissible. Congress did not speak to this precise issue in enacting EPCA and, furthermore, it specifically delegated the process of setting light truck fuel economy standards with *broad* guidelines concerning the factors that the agency must consider. NHTSA has remained within the reasonable range permitted by those factors. Consequently, the petition for review is without merit.

SCALIA, Circuit Judge, dissenting in Nos. 85–1231 & 85–1348:

Compared to the remote and speculative injuries alleged as the basis for standing in these two cases, the harm rejected as a basis by the Supreme Court in its latest expression on the subject was positively imminent. It is impossible to reconcile our

---

**104.** 627 F.2d 346 (D.C.Cir.1980). *Claybrook* involved a challenge to NHTSA's exemption of several small manufacturers of luxury cars from the fuel economy program. EPCA provides for an exemption if the applicable standard is "more stringent than the maximum feasible average fuel economy level which such manufacturer can attain." 15 U.S.C. § 2002(c) (1982).

entertainment of these suits with a long line of precedent culminating, most recently, in *Diamond v. Charles*, —— U.S. ——, 106 S.Ct. 1697, 1705–07, 90 L.Ed.2d 48 (1986), where the effect upon a pediatrician's patient pool of a judicial ruling facilitating abortions was held too speculative to sustain suit. If the injuries hypothesized by the interest groups suing in the present cases are sufficient, it is difficult to imagine a contemplated public benefit under any law which cannot—simply by believing in it ardently enough—be made the basis for judicial intrusion into the business of the political branches. What we achieve today is not judicial vindication of private rights, but judicial infringement upon the people's prerogative to have their elected representatives determine how laws that do not bear upon private rights shall be applied.

Because the standing issues presented by the two cases are virtually identical, I discuss them both in this single dissent.

### I

"Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76, 102 S.Ct. 752, 760–61, 70 L.Ed.2d 700 (1982) (footnote omitted). The Supreme Court has set forth the following test for this prerequisite:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41

[96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).

*Id.* at 472, 102 S.Ct. at 758 (footnote omitted). I think it abundantly clear that the Center for Auto Safety, Public Citizen, and the Union of Concerned Scientists have not passed this test.[1]

Petitioners observe at the outset that they have filed other petitions against similar NHTSA actions, and that those petitions were not dismissed for lack of standing. *See Center for Auto Safety v. Peck*, 751 F.2d 1336 (D.C.Cir.1985); *Public Citizen v. Steed*, 733 F.2d 93 (D.C.Cir.1984); *Center for Auto Safety v. NHTSA*, 710 F.2d 842 (D.C.Cir.1983); *Center for Auto Safety v. Claybrook*, 627 F.2d 346 (D.C.Cir. 1980). In those cases, however, petitioners' standing was neither challenged by NHTSA nor discussed by the court. It is well established that cases in which jurisdiction is assumed *sub silentio* do not serve as binding authority for the proposition that jurisdiction exists. *See, e.g., Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984); *Hagans v. Lavine*, 415 U.S. 528, 535 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974); *United States v. More*, 7 U.S. (3 Cranch) 159, 172, 2 L.Ed. 397 (1805) (Marshall, C.J.).

In addition, however, petitioners make a rather half-hearted effort to allege injury which they or their members will suffer unless this court grants them the requested relief. To satisfy Article III standing requirements, however, the asserted injury must be "distinct and palpable," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), "particular [and] concrete," *United States v. Richardson*, 418 U.S. 166, 177, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974), and "specific [and] objective," *Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972), rather than "conjectural [or] hypothetical," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675

---

1. I agree with the majority that the Environmental Policy Institute lacks standing. *See* Maj. op. at 1328 n. 41 (No. 85–1231).

(1983), "remote [and] unsubstantiated by allegations of fact," *Warth v. Seldin*, 422 U.S. at 507, 95 S.Ct. at 2209, "speculative," *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 42–46, 96 S.Ct. 1917, 1926–28, 48 L.Ed.2d 450 (1976), or "abstract," *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Moreover, when a litigant alleges only future injury, the harm must be " 'certainly impending,' " *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)), and "real and immediate," *City of Los Angeles v. Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665. Although "[t]he fact that harm or injury may occur in the future is not necessarily fatal to a claim of standing[,] … [it can] lessen the concreteness of the controversy and thus mitigate [*sic*] against a recognition of standing." *Harrington v. Bush*, 553 F.2d 190, 208 (D.C.Cir.1977) (footnote omitted).

The petitioners' first allegation of injury rests on the following chain of hypotheses and predictions: NHTSA's anticipated delay in promulgation of future standards will make impossible the establishment of "maximum feasible" fuel-economy standards, because NHTSA must give manufacturers sufficient lead time if it wishes to set standards that require manufacturers to alter their production plans; the unlawfully low standards already promulgated, and those anticipated as a result of NHTSA's delay, have resulted and will result in increased sales of fuel-inefficient light trucks and decreased sales of fuel-efficient light trucks; such a sales pattern will result in increased gasoline consumption; increased gasoline consumption will lead to a reduction in the United States' energy reserves; and, finally, such a reduction will result in longer gasoline lines and a greater risk of gasoline rationing in the event that foreign oil supplies are inter-

rupted. I think it apparent that this scenario, far from identifying a concrete threat of certainly imminent "specific future harm," *Laird v. Tatum*, 408 U.S. at 14, 92 S.Ct. at 2326, is nothing more than "an ingenious academic exercise in the conceivable," in which petitioners have merely "imagine[d] circumstances in which [they] *could* be affected by the agency's action." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) (emphasis added). *See, e.g., Diamond v. Charles*, 54 U.S.L.W. at 4422, 106 S.Ct. at 1705–07; *City of Los Angeles v. Lyons*, 461 U.S. at 105–10, 103 S.Ct. at 1666–70; *O'Shea v. Littleton*, 414 U.S. at 496–99, 94 S.Ct. at 676–78.

Petitioners also assert that they have standing as representatives of those of their members who wish to purchase the most fuel-efficient vehicles possible; that the current 1985 and 1986 standards do not achieve the maximum attainable levels of fuel economy; that NHTSA's failure to issue standards for 1989 and thereafter in a timely fashion will prevent the agency from imposing standards that achieve the maximum attainable levels of fuel economy; and that, as a consequence, the number of fuel-efficient light trucks and the range of fuel-efficient model options available to their members for purchase has been and will continue to be limited. But petitioners make no effort to identify any particular types of fuel-efficient light truck or any particular fuel-saving model options that their members desire but are or will be unable to purchase. Although it is as true of this court as of the Supreme Court that our standing cases have not exhibited "complete consistency," *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760, I think it clear that petitioners' bald assertion, unsupported by concrete factual allegations, that unidentified members of their organizations [2] may be unable to purchase unidentified types of fuel-efficient light trucks or

---

**2.** *Cf. Warth v. Seldin*, 422 U.S. at 502, 95 S.Ct. at 2207 ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.").

light-truck model options is simply insufficient to fulfill the Article III requirement that complainants allege facts sufficient to establish that they will suffer a concrete, palpable, and distinct injury. *See, e.g., United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1378–80 (D.C.Cir.1984); *American Society of Travel Agents, Inc. v. Blumenthal,* 566 F.2d 145, 148–49 (D.C.Cir.1977), *cert. denied,* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978).

## II

In addition to failing to allege any injury sufficient to give them Article III standing, petitioners also have failed to establish that their members' alleged inability to purchase unidentified types of light trucks or light-truck model options is "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 38, 96 S.Ct. at 1924.

## A

In No. 85–1348, petitioners allege that NHTSA's untimely issuance of the standards prevents the agency from imposing standards which require light-truck manufacturers to make substantial alterations in their production plans, because those plans must be made well in advance. But even if that is true, petitioners still must allege facts sufficient to demonstrate that in the event of timely issuance it would be substantially likely that their unidentified members' desires to purchase unspecified products would be satisfied. *See Von Aulock v. Smith,* 720 F.2d 176, 180 (D.C.Cir. 1983); *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258, 261– 66 (D.C.Cir.1980). This petitioners have utterly failed to do.

Even if I were inclined to attempt to remedy that failure—and I am not—petitioners' own arguments cast serious doubt on whether such a demonstration could ever be made. An order by this court compelling NHTSA to issue future standards in a timely fashion would remedy the

injury alleged by petitioners only if (1) NHTSA were thereby enabled to issue standards significantly higher than those it could have issued had the standards been issued dilatorily; (2) manufacturers attempted to meet the lower standards rather than paying noncompliance fines; and (3) manufacturers chose to meet the lower standards by introducing light trucks or light-truck model options that would otherwise not have been available, rather than by, for example, merely selling relatively greater numbers of their already-existing fuel-efficient light trucks. Petitioners themselves make clear that each of these contingencies is nothing near to certain. As to the first, petitioners' briefs indicate their agreement with NHTSA's repeated observations that, because of the long lead times necessary for manufacturers to introduce new technology into their manufacturing processes, NHTSA has "only limited" opportunities to set standards which would require such innovation *even when the standards are promulgated well over eighteen months prior to the beginning of the relevant model year.* See Brief for Petitioners (No. 85–1348) at 12–13; Reply Brief for Petitioners (No. 85–1348) at 14– 15. As to the second contingency, petitioners have noted in a slightly different context that when NHTSA sets a demanding standard, manufacturers can be expected to pay noncompliance fines (and perhaps to pass them through to customers) rather than take drastic measures to comply with the standard. *See* Brief for Petitioners (No. 85–1231) at 50–51; Reply Brief for Petitioners (No. 85–1231) at 11–15. Finally, as to the third contingency, petitioners forcefully contend that light-truck manufacturers have substantial ability to change the average fuel efficiency of their light-truck fleets merely by selling fewer fuel-inefficient light trucks and more fuel-efficient light trucks. *See* Brief for Petitioners (No. 85–1231) at 52–54.

In light of the doubt that surrounds each of its component links, and petitioners' failure to adduce any evidence as to those links, the chain of events that would have

to occur if an order compelling NHTSA to promulgate future standards in a timely fashion were to remedy the alleged inability of petitioners' members to purchase the types of light trucks they desire seems to me far too speculative to justify the exercise of judicial power. *See, e.g., Diamond v. Charles,* 54 U.S.L.W. at 4422, 106 S.Ct. at 1705–07; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 40–46, 96 S.Ct. at 1925–28; *Safir v. Dole,* 718 F.2d 475, 479–81 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984); *Physicians' Education Network, Inc. v. HEW,* 653 F.2d 621, 623–24 (D.C.Cir.1981).

## B

In No. 85–1231, petitioners concede, as they must, that an order vacating the current standards for model years 1985 and 1986 and setting new standards of 21.0 miles per gallon for both model years (the relief petitioners request) "will have no effect" on the products available to their members in model year 1985 (which has ended) and "is unlikely to have much effect" on the products available in model year 1986 (which is approximately half over). Reply Brief for Petitioners (No. 85–1231) at 9–10. They nevertheless contend that retroactively setting higher standards for model years 1985 and 1986 will threaten manufacturers with civil penalties for their failure to comply with the higher standards. *See* 15 U.S.C. § 2008. Because penalties for inadequate past performance can be avoided by exceeding standards in future years, *see* 15 U.S.C. § 2002(*l* )(1)(B)(i), (*l* )(1)(C), (*l* )(3), petitioners conclude that manufacturers will likely introduce new technology that they otherwise might not have introduced, which technology will then become available to petitioners' fuel-conscious members.

The most obvious difficulty with this scenario is its premise. I think it apparent that NHTSA could not lawfully impose civil penalties on light-truck manufacturers who, although they complied with the standards for model years 1985 and 1986 dur-ing those model years, did not comply with a new, higher standard set after the model years were over and applied retroactively. *See, e.g., Gates & Fox Co. v. OSHRC,* 790 F.2d 154, 156–57 (D.C.Cir.1986); *Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1335–37 (6th Cir.1978); *Diamond Roofing Co. v. OSHRC,* 528 F.2d 645, 649 (5th Cir.1976). And even if one were to assume that NHTSA had such power, there is no substantial likelihood that the series of events petitioners have constructed will come to pass after petitioners are granted the relief they have requested. As has been remarked above, manufacturers might well react to the threat of civil penalties either by merely paying them or by altering the marketing of currently available products, rather than by installing the unidentified new technology petitioners' members allegedly desire to purchase.

\* \* \* \* \* \*

As far as can be discerned from the allegations of these plaintiffs, the question whether there is adequate reason for late issuance of light-truck fuel economy standards is of interest only to the society at large, and should be resolved through the political mechanisms by which that society acts. There is no basis for believing that these plaintiffs have suffered the personal hurt that alone justifies judicial interference with execution of the laws. I believe that the petition for review in No. 85–1231 and petition for a writ of mandamus in No. 85–1348 should be dismissed for lack of jurisdiction.