806 F.2d 1071
 25 ERC 1265, 256 U.S.App.D.C. 385, 55
USLW 2327,
17 Envtl. L. Rep. 20,712
 CENTER FOR AUTO SAFETY, et al., Petitioners,
v.
Lee M. THOMAS, Administrator, Environmental Protection
Agency, et al., Respondents,
Automobile Importers of America, Inc., Ford Motor Company,
et al., Intervenors.
 No. 85-1515.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 6, 1986.
Decided Dec. 2, 1986.
As Amended Dec. 2, 1986.
Rehearing En Banc Granted Feb. 6, 1987.*
 
 Cornish F. Hitchcock, with whom Alan B. Morrison and Clarence M. Ditlow, III, Washington, D.C., were on the brief for petitioners.
 Nancy A. Ketcham-Colwill, Atty., E.P.A., with whom Francis S. Blake, Gen. Counsel, Peter Wyckoff, Acting Associate Gen. Counsel, Gerald K. Gleason, Asst. Gen. Counsel, E.P.A., and John F. Cermak, Jr., Attorney, Dept. of Justice, Washington, D.C., were on the brief for respondents.
 Hal D. Cooper, with whom Dennis M. Kelly, Robert C. Kahrl, Cleveland, Ohio, Blake A. Biles, Charles P. Murdter, Washington, D.C., Charles H. Lockwood, II, Detroit, Mich., Paula Winkler-Doman, Dearborn, Mich., William L. Weber, Jr., and Thomas L. Arnett, Detroit, Mich., were on the brief for intervenors, Automobile Importers of America, Inc., Ford Motor Co. and General Motors Corp.
 Before WALD, Chief Judge, RUTH B. GINSBURG and BORK, Circuit Judges.
 Opinion for the Court filed by Chief Judge WALD.
 Concurring opinion filed by Circuit Judge BORK.
 WALD, Chief Judge:
 
 
 1
 The Environmental Protection Agency ("EPA") is responsible for testing the fuel efficiency of automobiles to be marketed in the United States, and for reporting the corporate average fuel economy ("CAFE") rating of each manufacturer's sales fleet to the Department of Transportation ("DOT") so that the DOT may in turn monitor compliance with the fuel economy standards defined under the Energy Policy Conservation Act of 1975 ("EPCA").[1] The EPA Administrator has been assigned the task of establishing "testing and calculation procedures" for determining fuel economy and instructed to follow the procedures utilized for model year 1975 or "procedures which yield comparable results." 15 U.S.C. Sec. 2003(d)(1). The motivation for the comparability requirement was a concern that measured improvements in fuel economy represent real gains, and not merely differences in laboratory testing procedures.
 
 
 2
 Petitioners, four nonprofit membership organizations that promote energy conservation, have challenged an EPA rule designed to compensate manufacturers retroactively for testing procedure changes that negatively affected the comparability of measured fuel economy with 1975 results. They argue that the EPA was without statutory authority to apply retroactive adjustments for changes in test procedures that artificially lowered manufacturers' measured fuel economy. Alternatively, the petitioners contend that if retroactive adjustments are permitted under the EPCA, the EPA was required to compensate for procedure changes that artificially inflated measured fuel economy as well as those that deflated it.
 
 
 3
 Petitioners did not participate in the rulemaking proceedings before the EPA. Although we conclude that petitioners clearly have standing to bring this challenge, and that the judicial review provisions of the EPCA do not limit review to challenges of the administrative proceedings by parties to those proceedings, see 15 U.S.C. Sec. 2004, we decline to decide in the first instance on appeal questions which no party raised before the agency. Where the issue has been clearly raised before the agency by another party, however, we find no reason to abstain from reviewing the agency's considered decision on the matter.
 
 
 4
 On the merits, we conclude that the EPA correctly decided that no CAFE adjustments were warranted by changes in procedures for determining road load power settings, but that it erred in refusing to debit manufacturers retroactively for the inflationary changes in measured fuel economy achieved through the use of vehicles with high accumulated mileage.
 
 I. BACKGROUND
 
 5
 In 1975 Congress enacted comprehensive energy conservation legislation requiring, among other things, that manufacturers double the average fuel economy of new cars by 1985. 15 U.S.C. Sec. 2002. Congress mandated the goal of doubling fuel efficiency within 10 years, and delegated to the EPA the task of setting, for intervening years, standards consistent with that goal. The statutory scheme provided manufacturers with considerable flexibility in meeting their goal: fuel economy standards were to be applied not to each car, but to each manufacturer's sales fleet on a sales-weighted basis; moreover, the legislation allowed manufacturers to carry forward or backward up to three years any improvements in fuel economy beyond those required by the Act.
 
 
 6
 There were, however, stiff monetary penalties for failure to meet the applicable standards. Congress directed the DOT to fine each manufacturer five dollars for every tenth of a mile per gallon by which its CAFE missed the required fuel economy standard, multiplied by the number of cars in its sales fleet for that year. The magnitude of the potential fines and the flexibility of the carry forward and backward provisions created a powerful incentive for manufacturers to surpass applicable standards in some years in order to be able to offset deficiencies in other years.[2]
 
 
 7
 The EPA is responsible for conducting the fuel economy tests. Congress allowed the agency to develop "procedures that are more accurate or easier to administer"[3] than the 1975 testing procedures; yet it also insisted that any revised or substituted procedures yield results "comparable" to those recorded in model year (MY) 1975 testing. Congress intended that by 1985 real fuel economy, not merely the results registered as a consequence of changed test procedures, would double. In order to allow manufacturers sufficient time to deal with revised procedures, Congress also required the EPA to promulgate any revisions other than technical or clerical amendments "not less than 12 months prior to the model year to which such procedures apply." 15 U.S.C. Sec. 2003(d)(3).
 
 
 8
 In 1979, two automobile manufacturers filed petitions with the EPA claiming that certain changes in procedures employed since MY 1975 testing had caused their measured fuel economies to be lower than they would have been under the original procedures. Although the EPCA permits procedure changes, they argued, it requires that appropriate adjustments be made to insure the resultant fuel economy averages are "comparable" to 1975 results. The EPA Administrator denied the manufacturers' request for CAFE adjustments, and General Motors Corp. and Ford Motor Co. appealed to the Sixth Circuit.
 
 
 9
 The Sixth Circuit remanded the case to the EPA to initiate a rulemaking "concerning procedures for establishing an adjustment factor for current tests to determine the corporate average fuel economy of manufactured vehicles covered by this statute." General Motors v. Costle, 698 F.2d 1219 (1982). The court's order let the EPA determine which specific test procedures required adjustment, and what the magnitude of those adjustments should be.
 
 
 10
 Three and one-half years later, after reviewing the technical data and collecting and analyzing public comments to its proposed rule, the EPA completed its rulemaking.[4] It granted manufacturer-specific CAFE adjustments to compensate for the adverse impacts of certain changes in test procedures adopted after 1975.[5] The EPA also adopted one prospective-only adjustment,[6] and established regulations for determining the CAFE effects of future changes in procedures.
 
 
 11
 Petitioners have raised several challenges to the EPA's rules. They assert that the EPA lacks authority to make retroactive CAFE adjustments, because such adjustments constitute changes to "testing or calculation procedures," which the statute subjects to a twelve-month advance notice requirement.[7] Although they do not question the EPA's conclusion that manufacturers were indeed adversely affected by certain changes in testing procedures, petitioners insist that any retroactive change is barred by statute.[8]
 
 
 12
 Petitioners also challenge the EPA's decision not to apply retroactively any negative CAFE adjustments for changes in test procedures that have unduly benefited manufacturers. They assert that if the EPA has the authority to make retroactive adjustments, it is required to make all appropriate adjustments, not just those favorable to manufacturers. In particular they point to two adjustments that the EPA considered and declined to make: one dealing with road load power settings and the other with mileage accumulation limits.[9] It is conceded that if the EPA permitted adjustment of manufacturers' CAFE ratings retroactively to take into account these changes, most or all of the positive CAFE adjustments actually awarded as a result of the rulemaking would have been cancelled out.
 
 II. STANDING
 
 13
 As a threshold matter we find on the basis of a recent decision of this court that petitioners have standing to bring this challenge. See Center for Auto Safety v. National Highway Traffic Safety Administration, 793 F.2d 1322 (D.C.Cir.1986) (finding that same group of petitioners had standing to bring challenge on basis of same statute, alleging similar injury). As membership organizations, they seek to protect their members' interests in the widest possible choice of the most fuel-efficient vehicles that can be manufactured.[10] The EPA's decision to award manufacturers CAFE credits, which may be carried forward or backward for three years to offset penalties, and to refrain from debiting them for retroactive changes, removes substantial financial incentives to produce more fuel-efficient vehicles in the future. We have recently held that this very same relationship between the CAFE credits and fuel-efficient cars constitutes a cognizable and redressable "injury in fact" to consumers for standing purposes. Id. at 1332-33.
 
 III. EXHAUSTION
 
 14
 The EPA argues that "those who refrain from participation in rulemaking proceedings may not obtain judicial review of the regulations resulting." Nader v. NRC, 513 F.2d 1045, 1055 (D.C.Cir.1975). Because petitioners failed to participate in the CAFE adjustment rulemaking despite their earlier involvement with this issue as amicus curiae in the Sixth Circuit litigation, the EPA urges us to dismiss their petition for review. Petitioners have no explanation for not participating in the rulemaking; they argue, nonetheless, that their challenge to the EPA's statutory authority to apply retroactive adjustments poses a purely legal question that may be first decided by a reviewing court. Petitioners also note that the arguments they raise with regard to the applicability of specific negative adjustments were raised below by other parties and were fully considered by the agency.
 
 
 15
 Unlike the statutory review provisions in most of the cases cited by the EPA, the EPCA does not specifically require exhaustion of administrative remedies or participation in rulemaking proceedings, as prerequisites to seeking judicial review.[11] Nonetheless, "exhaustion ... is a generally recognized common law principle," Safir v. Kreps, 551 F.2d 447, 452 (D.C.Cir.), cert. den. 434 U.S. 820, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977), and absent compelling circumstances, we will not permit petitioners to bypass the administrative process and seek judicial resolution of an issue never raised before the agency:
 
 
 16
 Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.
 
 
 17
 United States v. L.A. Tucker Truck Lines, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). Petitioners suggest that because the issue of the EPA's authority to make retroactive adjustments is a purely legal one, we may decide it in the first instance. They assert that no factual findings need be made and no administrative record need be developed in order to conclude that the Sec. 2003(d)(3) requirement that an "amendment" to "testing and calculation procedures" be promulgated twelve months in advance applies to CAFE adjustments. We are persuaded, however, by the EPA's assertions that complex statutory and even technological issues may be involved in deciding whether CAFE adjustments are in fact amendments to testing and calculation procedures, and even if they are, whether particular ones may be mere technical or clerical amendments acknowledgedly exempt from the advance promulgation requirement. We decline to make such a crucial determination with such widespread ramifications for the administration of the entire CAFE scheme without the benefit of "an executive department's construction of a statutory scheme it is entrusted to administer." Chevron v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 
 18
 We arrive at a different result, however, with respect to dismissal of issues that were raised before the agency by other parties. If the agency has been clearly alerted to an issue and has had an opportunity to apply its expert judgment to it, the mere fact that the person seeking review of the agency's decision is not the same one who originally raised it is immaterial, at least under this statute. "So long as the appellant or some other party has put an objection on the record, the obligation to exhaust is discharged." Safir v. Kreps, 551 F.2d at 452. This court has often entertained challenges by litigants who failed to participate in the administrative proceeding, about issues that had in fact been considered there. See, e.g., Natural Resources Defense Council v. EPA, 804 F.2d 710 (D.C.Cir.1986); Washington Association for Television and Children v. FCC, 712 F.2d 677, 682 n. 10 (D.C.Cir.1983); Etelson v. Office of Personnel Management, 684 F.2d 918, 923 (D.C.Cir.1982); ASARCO, Inc. v. EPA, 578 F.2d 319, 320-21 n. 1 (D.C.Cir.1978).
 
 
 19
 In this case, the issue of whether negative CAFE adjustments should be made to compensate for past changes in procedures relating to road load power settings and mileage accumulation limits was raised by Chrysler during the rulemaking comment period. See Comments of Chrysler Corp. (Jan. 22, 1985), J.A. at 120-23. The EPA's technical staff itself noted the upward bias of CAFE ratings resulting from the use of test vehicles with higher mileage accumulation. See Technical Report, CAFE Corrections for Test Procedure Changes (October 1983), J.A. at 70-73. Ford addressed the issue of whether the procedure for measuring road load represented a departure from MY 1975 procedures. See Comments of Ford Motor Co. (April 19, 1984), J.A. at 109-112. Perhaps the clearest indication that the EPA fully considered and decided these questions is found in its articulation of reasons for neither proposing nor adopting the negative adjustments proposed here. See Final Rule, 50 Fed.Reg. 27,172, at 27,180-81 (1985) (to be codified at 40 C.F.R. pt. 600); Notice of Proposed Rulemaking, 48 Fed.Reg. 56,526, at 56,529-31 (1983). Since we conclude that all parties to the rulemaking, including the EPA, had more than adequate opportunity to address the negative CAFE adjustments involved in this appeal, we proceed to evaluate EPA's determination on the merits.
 
 IV. MERITS
 
 20
 The parties agree that if the EPCA's "comparability" requirement authorizes retroactive CAFE adjustments, it mandates that all appropriate adjustments be made; the EPA may not merely compensate manufacturers for test procedure changes that adversely affected their CAFE ratings, without also correcting for changes that improperly boosted their measured fuel economy. Petitioners challenge the EPA's refusal to adjust retroactively for two post-1975 changes that they assert yielded higher CAFE results than the MY 1975 procedures.
 
 A. Road Load Power Settings
 
 21
 Fuel economy is tested in the laboratory under simulated road conditions. The laboratory conditions cannot totally duplicate the open road, but they do produce consistent and replicable results that approximate on-the-road driving. The first retroactive CAFE dispute arises out of attempts to make these laboratory conditions more realistic.
 
 
 22
 Road load power is the amount of power that is required to overcome resistance and keep an automobile traveling steadily at fifty miles per hour. During laboratory testing, which is conducted on a set of dynamometer rollers on which the vehicle's wheels must turn, a power absorption unit is adjusted to reflect the amount of road load power that a particular vehicle requires to overcome resistance. The setting will necessarily vary from model to model. For MY 1975, two methods of setting vehicle road load were available to manufacturers, although one--a table of settings relating vehicle weight to road load power[12]--was predominantly used. The alternative method, which measured "manifold intake pressure,"[13] was used that year only by manufacturers whose vehicles incorporated a more advanced aerodynamic design. That method became impractical soon thereafter because changes in emission control techniques interfered with its use.
 
 
 23
 In 1976, the EPA announced that the "coastdown method," among others, would be considered an acceptable alternative method of measuring road load.[14] The coastdown method, like the manifold intake method, credited a vehicle's aerodynamic efficiency. It is undisputed in this litigation that the two methods "yield comparable results." Nonetheless, petitioners label the coastdown announcement a test procedure change, arguing that the manifold intake procedure was not a part of the MY 1975 yardstick, since virtually no manufacturer used it that year. We disagree with petitioners' conclusion.
 
 
 24
 The critical fact is that a procedure that credited reductions in a vehicle's road load power requirements achieved through improved aerodynamic design was available for MY 1975 testing, and those manufacturers, however few in number, that found it advantageous to do so, employed that procedure. The manifold intake procedure subsequently became obsolete for other reasons, but its basic function, to measure real improvements in fuel economy through more aerodynamically efficient designs, lived on in the form of the coastdown technique for measuring these aerodynamic improvements. We credit the EPA's finding that increases in measured fuel economy because of the lower road load settings obtainable under the coastdown method, were increases "likely to be observed on the road," and were not "unrepresentative artifact[s] of the dynamometer test procedure."[15] Such real improvements are exactly what Congress meant to measure when it afforded the EPA flexibility to change testing and calculating procedures.[16] We agree with the EPA that no retroactive adjustment need be made on account of the coastdown technique.
 
 B. Mileage Accumulation Limits
 
 25
 Evidence in the record demonstrates that an automobile's fuel economy generally improves as it accumulates mileage. During an initial "break in" period, fuel economy improves steadily as a result of reduced friction; this effect is retained until the vehicle accumulates 20,000-30,000 miles. In 1975, the principal source of fuel economy data was from vehicles tested at an average of around 4,000 miles. In 1976, when the EPA promulgated fuel economy testing regulations pursuant to the EPCA, as a cost-saving measure, it included in the CAFE database "fuel economy data vehicles," to be tested between 4,000 and 10,000 miles. Although in the rulemaking under review the EPA concluded that allowing vehicles to be tested at the higher mileage accumulation levels "effectively eases the CAFE standards that manufacturers must meet." Final Rule, 50 Fed.Reg. at 27,180, it decided to implement only prospectively, an adjustment formula that would lower CAFE ratings for vehicles tested at high accumulated mileages. The EPA determined that the difference between the measured fuel economy of vehicles tested at 4,000 and 6,200 miles was relatively small and not worth adjusting. But it did deem necessary a prospective adjustment to account for the difference between vehicles with 6,200 and 10,000 miles in order to "compensate for the most serious cases of bias resulting from higher mileage accumulation." Id. at 27,181.
 
 
 26
 In the Final Rule, the EPA stated it was not making negative CAFE adjustments for the "inappropriately high" test results resulting from high mileage vehicles used in the past because
 
 
 27
 the adjustment is necessarily sensitive to each manufacturer's test fleets and could have severe impacts not anticipated by each manufacturer when testing was conducted.
 
 
 28
 Id. at 27,181. Previously, in its Notice of Proposed Rulemaking, the EPA had given another reason for denying retroactive effect to the high mileage adjustment:
 
 
 29
 [W]hile the change in the accumulated mileage limitation was not intended to provide CAFE benefits, retroactively removing any CAFE gains from this change would, in effect, penalize manufacturers for taking advantage of a cost-saving measure that EPA had specifically allowed. Also, manufacturers would not be treated equitably if no CAFE adjustment were provided [as a result of netting all positive and negative adjustments] since only the domestic manufacturers have obtained significant CAFE gains by testing vehicles at higher mileages.
 
 
 30
 48 Fed.Reg. at 56,532. Neither reason withstands scrutiny.
 
 
 31
 The prophecy that adjustments would vary from manufacturer to manufacturer is irrelevant. Indeed in the same rulemaking, the EPA concluded that it would be "technically inaccurate" to make industry-wide adjustments because it overcompensated some manufacturers while undercompensating others. 50 Fed.Reg. at 27,175-76. Similarly, the EPA's concern about unfairly withholding positive adjustments from foreign manufacturers, who have not artificially inflated their CAFE ratings, is answered by its decision to make manufacturer-specific adjustments.
 
 
 32
 The EPA's final argument that a retroactive debit would be unfair and unanticipated is also unpersuasive. The manufacturers were clearly aware of the possibility, and in fact strongly supported the premise, that if past procedures are shown to have distorted the comparability of CAFE ratings, adjustments should be made, in whichever direction they point. The EPA allowed manufacturers to use vehicles with high mileage accumulation levels as a cost-saving measure. Instead of requiring new and different vehicles for each test, the EPA permitted manufacturers to reuse some vehicles for testing purposes. This change in procedure, like others promulgated by the EPA since 1975 to make the testing process "easier," had the unintended consequence of distorting fuel economy measurements. The appropriate regulatory response to the discovery of such a test procedure defect, is the application of a corresponding CAFE adjustment. This is true in the case of excessive accumulated mileage limits no less than in the case of improper distance measurements, inadequate inertia weight categories and other problems corrected in the rule under review, see supra note 5. The CAFE adjustment formula, applied either retroactively or prospectively, does not--in a true sense--penalize anyone. The mere fact that manufacturers did not know in advance that data from their high mileage accumulation vehicles would be adjusted to compensate for the improved fuel economy results they unexpectedly produced does not make it unfair to do so. The manufacturers retain the cost-saving, but lose the artificial and accidental CAFE windfall.[17]
 
 
 33
 In addition to these reasons for not making retroactive negative adjustments, EPA noted that it did not have sufficient evidence to conclude that the use of vehicles with high mileage accumulation levels was actually a departure from MY 1975 procedures. 50 Fed.Reg. at 27,180. It argues that if high mileage accumulation vehicles were used in developing the MY 1975 baseline, then any use of such vehicles in the CAFE data bases for subsequent years would not constitute a change in testing procedures requiring adjustment.
 
 
 34
 Data from three different types of vehicles were used in establishing the MY 1975 14 m.p.g. baseline: emissions certification vehicles, subject to a 4,000 ± 250 miles limit; running change vehicles, subject to no regulatory mileage limitation;[18] and fuel economy data vehicles, tested pursuant to a then-voluntary labelling program, and subject to a 10,000 mile limitation. The record is incomplete on the question of how many vehicles were tested at what mileage levels in MY 1975. Available evidence suggests that in MY 1975, 80% of the vehicles tested had accumulated fewer than 4,250 miles.[19] We, like the EPA, know of no direct evidence regarding how many vehicles were tested with over 6,200 accumulated miles that year; but even after a documented upward trend in the average accumulated mileage of domestic manufacturers' test fleets, current CAFE data comes from test vehicles 90% of which have accumulated fewer than 6,200 miles. Id.
 
 
 35
 The record evidence thus strongly suggests that the 1975 baseline was arrived at by using primarily vehicles under 6,200 miles, although some higher mileage vehicles were used.[20] The EPA admits that the increasing use of high mileage vehicles has "erode[d] the accuracy of CAFE estimates." 50 Fed.Reg. at 27,181. Indeed, this erosion is the basis for EPA's pronouncement that "[m]aintaining the stringency of CAFE standard definitely requires the enforcement of a mileage accumulation limit," id. at 27,180. We cannot see why the fact that a small percentage of vehicles may have been tested at high mileage levels for MY 1975, without substantial impact on the 14 m.p.g. baseline, supports a decision to ignore all high mileage testing in the past 10 years of whatever dimensions or however greatly it may have perverted the comparability of results with MY 1975. It is, after all, the average mileage of cars comprising the MY 1975 database that affects comparability of results with later years, not whether a few high mileage vehicles were included. If, as the EPA recognized in its prospective rule, "average mileage accumulation since 1975 has steadily increased," id. at 27,181, then significant departures in testing procedures have occurred, and must be recognized.[21]
 
 
 36
 Ultimately, we find no reasonable basis for the EPA's decision to apply CAFE adjustments for high mileage accumulation only prospectively, and remand for reconsideration by the EPA of an appropriate retroactive adjustment to take account of the substantial post-1975 use of high mileage vehicles.[22]
 
 V. CONCLUSION
 
 37
 We decline to review petitioners' challenge to the EPA's statutory authority to make any retroactive CAFE adjustments because of the twelve-month advance notice requirement, because that issue was not raised before the agency. The specific challenges to the EPA's failure to make retroactive negative adjustments, however, are properly before us. We affirm the EPA's refusal to make any adjustment as a result of introducing the coastdown technique as an alternative measuring device for determining road load power settings. We reverse the agency's decision to make adjustments for the use of cars with higher mileage accumulation limits only prospectively and remand for proceedings consistent with this opinion.
 
 
 38
 It is so ordered.
 
 BORK, Circuit Judge, concurring:
 
 39
 I concur in the Court's opinion. I concur in part II of the opinion, however, only because we are bound on the issue of standing by the prior panel opinion in Center for Auto Safety v. National Highway Traffic Safety Administration, 793 F.2d 1322 (D.C.Cir.1986). But see id. at 1341 (Scalia, J., dissenting).
 
 
 
 *
 Opinion and judgment vacated, 810 F.2d 302. Decision reinstated on rehearing, 847 F.2d 843
 
 
 [1]
 Pub.L. No. 94-163, 89 Stat. 871 (1975) (codified as amended in 15 & 42 U.S.C.)
 
 
 [2]
 These provisions also allowed manufacturers to plan and adjust the composition of their fleets from year to year (i.e., increase or decrease the percentage of small, fuel-efficient vehicles), to avoid penalties or to take advantage of built-up CAFE "credits."
 
 
 [3]
 H.R.Rep. No. 340, 94th Cong., 1st Sess. 92 (1975), U.S.Code Cong. & Admin.News 1975, pp. 1762, 1854
 
 
 [4]
 Final Rule, 50 Fed.Reg. 27,172 (1985) (to be codified at 40 C.F.R. pt. 600)
 
 
 [5]
 The EPA's CAFE adjustments compensated for procedure changes involving distance measurement, inertia weight categories, dynamometer controllers, laboratory humidity, exhaust gas samplers, test fuel properties and energy efficient oils. The EPA made these adjustments applicable to 1980 and later model year passenger automobile CAFEs. See id
 
 
 [6]
 The EPA's decision to make negative CAFE adjustments, starting in MY 1987, for vehicles tested with over 6200 accumulated miles, is discussed in Part IV.B, infra
 
 
 [7]
 Section 2003(d)(3) provides that:
 Testing and calculation procedures applicable to a model year, and any amendment to such procedures (other than a technical or clerical amendment), shall be promulgated not less than 12 months prior to the model year to which such procedures apply.
 15 U.S.C. Sec. 2003(d)(3).
 
 
 [8]
 Petitioners would allow one equitable exception to this rule: since the Sixth Circuit held that the EPA had improperly rejected GM and Ford's petition for adjustment, any specific changes that should have been made at that time, i.e., for MY 1981 or 1982, may be made retroactively now. Br. for Petitioners, at 42 & n. 19
 
 
 [9]
 These two procedure changes are discussed in greater detail in Part IV, infra
 
 
 [10]
 Three petitioners claim standing on that basis. They are Center for Auto Safety, Public Citizen, and Union of Concerned Scientists. The fourth petitioner, Environmental Policy Institute ("EPI") asserts an institutional interest in promoting conservation in the automotive and other industries and claims to be adversely affected by the EPA's action. Because we find that the other three petitioners have standing, there is no need to decide EPI's standing. See, e.g., Watt v. Energy Educ. Action Found., 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981)
 
 
 [11]
 The judicial review provision of the EPCA is expansive:
 Any person who may be adversely affected by any rule prescribed under section 2001, 2002, 2003, or 2006 of this title may, at any time prior to 60 days after such rule is prescribed ... file a petition in the United States Court of Appeals for the District of Columbia, or for any circuit wherein such person resides or has his principal place of business, for judicial review of such rule.
 15 U.S.C. Sec. 2004(a). Its reference to "any person" instead of "any party" indicates that no prior participation in the controversy is statutorily required.
 
 
 [12]
 The table of values was specified at 40 C.F.R. 85.075-15(d) (1975)
 
 
 [13]
 The manifold intake technique measures the pressure of the air and fuel mixture entering the engine of a car driven at a constant speed on a flat road. The power absorption unit can then be set so that the vehicle generates the same pressure when it is operated on the dynamometer, thus simulating in the laboratory the vehicle's actual road load. The procedure is described at 40 C.F.R. 85.075-15(e)(2) (1975)
 
 
 [14]
 The coastdown procedure measures a vehicle's deceleration characteristics and duplicates those road or track measurements on the dynamometer. Like the manifold intake pressure procedure, this technique simulates the test vehicle's actual road load. See MSAPC Advisory Circular No. 55, March 26, 1976 and accompanying memorandum. (Attached to Br. for Respondent.)
 
 
 [15]
 Notice of Proposed Rulemaking, 48 Fed.Reg. at 56,531
 
 
 [16]
 H.R.Rep. No. 340, 94th Cong., 1st Sess. 92 (1975), U.S.Code Cong. & Admin.News 1975, pp. 1762, 1854
 
 
 [17]
 The basis for the EPA's assertion that retroactive adjustments would be unfair appears to be twofold: Had manufacturers known that the data from high mileage vehicles would be adjusted downward in the future they might have chosen not to use such vehicles. And their plans for sales fleets over the past several years might have been affected by a different net CAFE accounting. A negative retroactive adjustment now will require greater than expected efforts in coming years to achieve the same balance
 In the end, this all boils down to a general resistance to retroactive negative adjustments. Yet the statutory scheme would surely be distorted if only positive adjustments could be retroactively applied. The manufacturers must take the bitter with the sweet.
 
 
 [18]
 However, the record indicates that "historically, running change test vehicles averaged 4,000 miles." Technical Report at 2, J.A. at 59
 
 
 [19]
 Data is available for Ford vehicles tested in MY 1975. It is unclear, however, how industry-representative this information may be. The minimum and maximum mileages for Ford vehicles were 3,786 and 8,962 respectively. The unweighted average was 4,774. Comments of Ford Motor Company (April 19, 1984), J.A. at 116-17
 
 
 [20]
 The EPA concluded, and petitioners did not dispute, that the difference between measured fuel economy at 4,250 miles and 6,200 miles was relatively small and did not require any adjustment. See Final Rule, 50 Fed.Reg. at 27,181. Thus, we consider the higher figure of 6200 miles to be the relevant one in evaluating the data underlying the 1975 baseline
 
 
 [21]
 In the case of road load setting methods, the availability in MY 1975 of a procedure for crediting real fuel economy improvements achieved by greater aerodynamic efficiency shows that a later procedure that measures the same improvements is consistent with the regulatory scheme and does not distort comparability. On the other hand, the use of a few high mileage vehicles in MY 1975 testing provides no logical basis for permitting manufacturers to boost their measured fuel economy artifically and distort comparability of results by increasing the average mileage accumulation of their test fleets
 
 
 [22]
 For example, it may be appropriate to compensate only for the increase since MY 1975 in the average accumulated mileage of each manufacturer's test fleets; or the EPA may conclude that the testing of high mileage vehicles in MY 1975 was de minimis and decide to compensate for all vehicles tested above 6,200 miles since then. We leave this and related determinations initially to the agency's expertise